UNITED STATES of America

v.

Anthony D. VOLPE et al. (two cases).

UNITED STATES of America

v.

Girolomo SANTUCCIO.

UNITED STATES of America

v.

Anne STEFANOU.

UNITED STATES of America

v.

James SMUCKLER.

UNITED STATES of America

v.

John BARONE et al.

Crim. Nos. H-76-37—H-76-41 and H-75-123.

United States District Court, Connecticut.

March 15, 1977.

Peter C. Dorsey, U.S. Atty., New Haven, Conn., Paul E. Coffey, Peter R. Casey, III, Special Attys., Dept. of Justice, Hartford, Conn., for United States.

F. Mac Buckley, Hubert J. Santos, Hartford, Conn., for defendants Volpe and Sullivan.

Joseph E. Fazzano, William J. Dolan, Hartford, Conn., for defendant O'Brien.

Brenda A. Eckert (Shipman & Goodwin), Hartford, Conn., for defendant Della Ferra.

Richard S. Cramer, Asst. Federal Public Defender, Hartford, Conn., for defendant Boornazian.

Thomas J. Prior, Manchester, Conn., for defendant Poulin.

Eliot J. Nerenberg, West Hartford, Conn., for defendant Castagna.

John L. Hayes, Hartford, Conn., for defendant Di Beneditto.

Thomas G. Dennis, South Windsor, Conn., for defendant Jacomini.

S. V. Faulise, Hartford, Conn., for defendant Bovino.

Maxwell Heiman (Furey, Donovan & Heiman), Bristol, Conn., for defendant Chiarizio.

Leonard I. Shankman, Hartford, Conn., for defendant Morris.

S. Robert Verillo, Hartford, Conn., for defendant Cecchini.

Anthony F. Pagano, Manchester, Conn., for defendant Speziale.

Denuzze & Pignatella, New Britain, Conn., for defendant Mascola.

Edward R. Smoragiewicz, Hartford, Conn., for defendant Irace.

Paul F. McQuillan, Andre M. Kocay (Januszewski, McQuillan & DeNigris), New Britain, Conn., for defendant Lepito.

M. Donald Cardwell, Hartford, Conn., for defendant Guerriero.

Peter L. Truebner, Hartford, Conn., for defendant Campanelle.

John P. McKeon, Hartford, Conn., for defendant Grant.

Aaron P. Slitt, Hartford, Conn., for defendant Santuccio.

F. Mac Buckley, Hubert J. Santos, Hartford, Conn., for defendant Stefanou.

Edward W. Hebb, West Hartford, Conn., for defendant Smuckler.

Richard S. Cramer, Asst. Federal Public Defender, Hartford, Conn., for defendant Byrne.

Albert J. Genua, Jr., Hartford, Conn., for defendant Lisella.

J. Patrick Dwyer, East Hartford, Conn., for defendant Barone.

William P. Murray, Jr., West Hartford, Conn., for defendant Rago.

John L. Hayes, Hartford, Conn., for defendant Grande.

## RULING ON DEFENDANTS' CONSOLIDATED MOTIONS TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE

CLARIE, Chief Judge.

The defendants have filed consolidated motions and memoranda requesting the suppression of evidence obtained by the Government through searches and seizures, in particular through wire and oral interceptions carried out in pursuance of court orders issued under Rule 41, Fed.R.Crim.P., and 18 U.S.C. § 2518(10). Said motions request this Court to suppress all evidence originating in the surveillance authorized under the foregoing court orders. A multiple count indictment was handed down by the Grand Jury that considered the seized evidence, charging more than twenty defendants with the operation of an illegal gambling business, and with multiple other crimes carried out at their base of operations, a concentrated center of criminal activity. The law enforcement information emanating from the abovementioned surveillance related to the crimes of extortion, obstruction of justice, hi-jacking, conspiracy, and further revealed a general knowledge of narcotics violations, arson, prostitution, and other organized crime.

The defendants challenge the Court's interception orders on several grounds, namely: (1) that any statute authorizing a covert entry of private premises to effect a wire and oral interception is unconstitutional on its face and as applied to these defendants; (2) that certain defendants were not named in the Government's application, although there was reasonable cause to anticipate their conversations would be intercepted, an alleged violation of 18 U.S.C. §§ 2518(1)(b)(iv) and 2518(4)(a); (3) that all normal investigatory procedures had not been first exhausted, before granting authority to intercept; (4) that the communications in question were unlawfully intercepted, because the authorization was insufficient and the interceptions were not made in conformity with the court's order and the statute; (5) that the information in the applications, which formed the basis for the court's order, contained facts obtained from prior interceptions, which were themselves unconstitutional; (6) that the use of the pen register device was improperly granted and the authority for its use was unconstitutionally broad; and finally (7) that the information set out in the application was based on remote hearsay and was insufficient to establish probable cause for the granting of such an order.

After a full hearing on the issues, wherein testimonial evidence was offered by the parties on all material facts set out in the Government's original and supplemental applications, the Court finds that, under the circumstances of this case, the court's orders and their subsequent execution were reasonable and lawful; accordingly, the consolidated motions of the defendants to suppress are denied.

### Facts

On December 16, 1974, Peter R. Casey, III, a special attorney and investigative law enforcement officer with the Organized Crime and Racketeering Section of the United States Department of Justice, as defined in 18 U.S.C. § 2510(7), being duly authorized in writing by the Attorney General of the United States, William B. Saxbe, who was acting pursuant to Congressional authority, 18 U.S.C. § 2516, made an application to this Court for an order directing the interception of wire communications to and from the telephone number 203-247-

6309, at 103 New Britain Avenue, in Hartford, Connecticut.

Said application further requested authorization for the interception of oral communications from the premises of an enterprise known as the O'Brien-Sullivan Home Improvement Company, located at the aforesaid New Britain Avenue address. The statements set forth in the verified application, along with the testimony presented at an in-chambers record hearing, disclosed that an on-going investigation was being conducted under 18 U.S.C. §§ 1955 and 371, into possible violations of the law being committed by Michael T. O'Brien, John E. Sullivan, Ronald LeConche, Ernest Verdone, James Smuckler, John X. LeConche, Victor Parente, Ralph Irace, John A. Abronzio, Elliott Leff and others yet unknown, all operating out of the above-stated address.

Special Agent Dewey L. Santacroce of the Federal Bureau of Investigation, an experienced and reliable investigator with twenty-one years of FBI employment, filed a 37-page affidavit with the Court describing the history of the premises and his grounds for believing that a persistent illegal gambling business was being conducted at said location. This report recited a summary of prior law enforcement investigations and special surveillance efforts focusing upon this location for the period commencing August 2, 1974 through November 27, 1974. The affidavit disclosed a history of extensive criminal gambling activities on the part of many of the regular patrons at the premises, and it described the bare physical interior of the alleged business facilities. The store space was described as being held out to the public as the O'Brien-Sullivan Home Improvement Company, a street-level front with two large plate glass windows curtained from outside viewers by Venetian blinds which could be drawn.[1] Above the exterior door hung a large sign attached to the building which stated, "Insurance & Real Estate, Protect What You Have." Inside there was a room separated from a rear area by an 8-foot high paneled partition, running from the floor to the ceiling. In the front of the partitioned area opposite the entrance door there was a one-way view mirror, so that anyone working at the desk to the rear of the partitioned barrier, could observe the identity of strangers who entered, and give sufficient warning time to take necessary protective action against the intrusion of law enforcement officers. From the known facts, this supposed business premises was not a residence; nor was it a place where any business of a legitimate nature was being conducted. (In-chambers Tr., Dec. 16, 1974, at 17–18). In particular, the location was not a place for the sale of insurance or real estate. The office was unquestionably a sham and a "criminal blind" designed and maintained solely for the conduct of criminal activities.

A significant factor in this Court's authorization of oral interceptions by installing a "bug-microphone" within the premises was the verified information that "total telephone service," a new and devious adjunct to criminal operations, was in use at the 103 New Britain Avenue premises. Through the use of "total telephone service," a telephone call received at that address could be automatically switched to another telephone or telephones, by simply pushing a transfer button, and the call could subsequently be switched to still another number, (In-chambers Tr., Dec. 16, 1974, at 22), thus making it impossible to intercept and monitor the call, or to trace it to its ultimate receiver. This circumstance indicated that a telephone wire intercept alone would be likely to prove fruitless.

All of these factors were crucial to the Court's appraisal of the facts submitted by the prosecution, and in the Court's decision to authorize a covert entry. Responsible law enforcement officers represented that, to effectively carry out the placement of the bug-microphone for purposes of oral interception, there was no other practicable alternative.

On December 16, 1974, the prosecutor requested authority from the Court to in-

---

1. *See* Government Exhibit 2; Figure I, *infra*.

stall a pen register device intercepting the digit numbers of outgoing calls from the telephone numbered 203–247–6309, which was listed in the name of the O'Brien-Sullivan Home Improvement Company, at 103 New Britain Avenue, Hartford, Connecticut. He simultaneously requested authority to intercept wire and oral communications originating and being received at that address. Substantially identical evidence was presented to support both petitions. A formal recorded hearing was held in chambers at which probable cause was found and the Court, relying on the evidence presented to it, authorized the requested warrant permission. The Court also directed the Southern New England Telephone Company, a communication carrier under 18 U.S.C. § 2510(10), to furnish the petitioner with all necessary information, facilities and technical assistance necessary to accomplish the interception. The Government was ordered to pay the company prevailing rates of compensation for the services rendered.

The criminal activity described above was centered in premises located at the corner of New Britain Avenue and Julius Street, in the City of Hartford. As shown in the accompanying schematic figure, the building was L-shaped, its store front portion facing New Britain Avenue. A side entrance led to a common basement area via an exterior doorway at 11 Julius Street. Inside this entrance door at 11 Julius Street stood an interior door on the right which led down stairs to the common basement, where a coin-operated washer and dryer was located for use by the tenants living on the upper floors. An open area led to the furnace, and, beyond that, there was a large wire-mesh enclosure situated directly underneath 99 New Britain Avenue. In this enclosure, "John's Deli" store, located on the first floor, kept its inventory.

Underneath the premises next door to 99 New Britain Avenue, the address of which was 103 New Britain Avenue (i. e., the subject premises), there was a separate chicken wire-mesh enclosure, access to which could be gained only through a wire-mesh door. (Tr. 243–244). In the basement there were two separate telephone terminal boxes. (Tr. 245–246). One box was located within the wire-mesh enclosure under "John's Deli," the other box was in the general basement outside the enclosure, which had unrestricted access from 11 Julius Street.

Figure I. Demonstrative schematic representation of cellar premises. (based on Government Exhibit 3).

New Britain Avenue

In the early morning hours of December 17, 1974, pursuant to the authority of the court warrant, a covert, physical intrusion was made by means of a passkey into the 103 New Britain Avenue premises, to determine the feasibility of emplacing an oral microphone device.[2] (Tr. 299–300). The agents also attempted on that occasion to

2. "The National Wiretap Commission found that:

Title III contains no provisions which specifically regulate the method by which bugs are to

make an impression of the lock on the rear door to the common basement. No entry was actually made through that door, however. On the same date, the agents did enter the unlocked outer side door at 11 Julius Street which led to the cellar, and there inspected the lock on the door leading from the entry way to the basement (Tr. 302), but no entry into the common basement was actually made at that time.

On December 16, 1974, the day before the events just described, the telephone company advised Agent Puckett that the telephone line 203–247–6309, had its "binding-post appearances" in the basement of the building in which 103 New Britain Avenue was located, (Tr. 574) and that no "binding-post appearances" were available at any other location which were not already in full use. The agent relied on the information given to him by an experienced and authorized telephone company representative, who stated that engineering problems made the use of a binding-post appearance on a nearby outdoor telephone pole in the area to be infeasible. (Tr. 821–822, 830–832, 834–835, 840).

During the early morning hours of December 18, 1974, an agent entered through the front door of 103 New Britain Avenue by means of a passkey and installed an electronic microphone surveillance device in the floor next to a radiator. (Tr. 240). The wires were then run down into the basement through an existing hole next to a water pipe. At the same time, other agents entered the basement[3] through a door at the top of the cellar stairs at 11 Julius Street, using a skeleton key, and then unlocked a padlock on a chicken-wire barrier that separated the basement area directly underneath 103 New Britain Avenue from the general basement, to obtain access to the wires leading down from the oral interception equipment. The agents had been advised that the general basement area contained the appearances and binding-posts for the telephone number 203–247–6309. (Tr. 245, 308). However, after connecting the equipment, he was unable to get it to function.

That night, December 18, 1974, the agents returned to the basement area to determine why the equipment would not function and observed that there were other telephone wires leading into another telephone box inside the wire-mesh enclosure in the basement directly underneath 99 New Britain Avenue. (Tr. 250). On the following morning, December 19, 1974, Agent Santacroce reported to the Court, in an in-chambers recorded proceeding, that the other telephone box in the cellar was situated within the enclosed wire-mesh area directly underneath John's Delicatessen. The government prosecutor proposed a nighttime entry into the privately leased basement of the delicatessen in order to connect up its wires to the telephone binding-posts at that box, but this permission was withheld by the Court. (Tr. 256).

On the afternoon of December 19, 1974, the government agent arranged with the telephone company for a regular telephone repairman to accompany the agent into the store. The telephone company employee obtained oral permission from the store owner to go to the telephone equipment in the basement. Neither one of them was asked his identity, except that the repairman represented that he was from the telephone company and wanted access to the cellar to do some work on the equipment in the basement. Neither disclosed that the man with the repairman was in fact an FBI agent. (Tr. 256–257). The owner voluntarily gave his oral permission for both men to have free access to the telephone box in the wire-mesh enclosed basement area directly underneath the delicatessen. (Tr. 258–259). They proceeded to install three pairs of wires from the box in the enclosed wire-

---

be installed. . . . In some jurisdictions [under parallel state laws] surreptitious entry is authorized by a court order. In other areas, however, police officials have indicated a reluctance to apply for a Title III order to use bugs because of the statute's failure to establish guidelines and procedures." *United States v. Ford,* 553 F.2d 146 at 151 n. 22 (D.C.Cir. 1977).

3. *See* Government Exhibit 3; Figure I.

mesh cage out to the other telephone box in the open common basement area. Both men exited the basement premises through the delicatessen during regular business hours with no untoward incident. That same night the agents returned to the open basement area through the side door at 11 Julius Street and made the necessary wire and oral connections. On the night of December 20, 1974, the agents replaced the wires to the microphone, which had not been functioning (Tr. 264–265), and then returned, on December 30, 1974, to disconnect the equipment. (Tr. 266–267).

On January 10, 1975, the Government with written authorization from the Assistant Attorney General, Wallace H. Johnson, applied in a recorded chambers conference for a new interception order to renew the previous wire and oral interception order of December 16, 1974. Because the new application and proposed order did not include a reference to 11 Julius Street, the hearing was postponed. (In-chambers Tr., Jan. 10, 1975, at 35). The Assistant Attorney General of the United States submitted an amended authorization and, on January 16, 1975, the Court, after a fully recorded chambers hearing and after finding probable cause, signed a new order authorizing the further interception of wire and oral communications from the premises at 103 New Britain Avenue. That same evening, pursuant to the court warrant, the intercept taps were again reconnected. (Tr. 269–270). A final entry was made into the common basement the night of January 29, 1975, for the purpose of retrieving the microphone and disconnecting all the equipment. (In-chambers Tr., Jan. 30, 1975, at 4).

### Issues

1. (a) Does Rule 41, Fed.R.Crim.P., and 18 U.S.C. § 2518, confer upon the Court the discretion to order a wiretap and/or oral interception necessitating a covert entry; and (b) if so, is it required that the landlord or custodian of the premises be given notice of such contemplated action? If not, is the Court required to make a factual finding as to why such a notice should not be required?

2. Did the Government's failure to name certain defendants in the application who were likely to be overheard on the wire and oral interceptions violate 18 U.S.C. §§ 2518(1)(b)(iv) and 2518(4)(a)?

3. Do the defendants have "standing" to demand the suppression of evidence?

4. Did the Government demonstrate that less intrusive measures would not have sufficed?

5. Did the Government's failure to disclose to the Court the existence of a 1972 state wiretap violate 18 U.S.C. § 2518(1)(e); and did any of the information derived from the prior interceptions, which were unconstitutional, contaminate the authorization here?

6. Was the Court's order invalid because of overbreadth?

7. Did the original intercept application satisfactorily establish that other means of surveillance were unlikely to succeed?

8. Was the pen register invalid, because of being too broad and general a search?

9. Did the agents properly minimize the interception of non-criminal calls?

### Discussion of the Law

(a) *Lawfulness of the Original Search and Seizure Order*

Counsel have not only raised a challenge to the use of electronic surveillance in this case, but they also attack the reasonableness of the search and seizure process, as carried out by the government agents in installing wiretaps and the oral interception microphone by means of a technical trespass into the premises, when no occupant was present, involving a covert entry. The Court must therefore consider whether or not the issuance of the warrant transgressed the protective shield afforded by the fourth amendment to the federal Constitution, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-

zures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Supreme Court said in *Camara v. Municipal Court,* 387 U.S. 523, 528–529, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967):

"[O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

■ Precedent has also generally established that warrantless and unconsented-to electronic surveillance, accompanied by an unauthorized physical trespass onto the subject premises, will be considered to be a transgression of the basic protections afforded by the fourth amendment. *See Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); and *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

However, in 1968 Congress passed Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2516(1), wherein it conferred authority on the Attorney General or his specially designated assistant to sanction wiretaps and oral on-premise interceptions after a finding of probable cause and approval by a judge of the federal court. Much of Title III was drawn so as to satisfy the requirements for electronic surveillance set out by the Court in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). Precise and discriminate requirements were established under that new statute for the granting of such authority. The law laid down the prerequisites for prior judicial approval followed by close judicial supervision throughout the interception process.

In the case of *United States v. United States District Court,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1971), the executive department undertook independent electronic surveillance, purportedly to protect the National Security against subversive elements. The issues raised in that case required a determination of the restrictive limitations imposed by the fourth amendment upon covert surveillance. The Court set out the basic guidelines to be observed when it said,

"As the Fourth Amendment is not absolute in its terms, our task is to examine and balance the basic values at stake in this case: the duty of Government to protect the domestic security, and the potential danger posed by unreasonable surveillance to individual privacy and free expression. If the legitimate need of Government to safeguard domestic security requires the use of electronic surveillance, the question is whether the needs of citizens for privacy and free expression may not be better protected by requiring a warrant before such surveillance is undertaken. . . .

"Though the Fourth Amendment speaks broadly of 'unreasonable searches and seizures,' the definition of 'reasonableness' turns, at least in part, on the more specific commands of the warrant clause. . . ." *Id.* at 314–315, 92 S.Ct. at 2135–2136.

At pages 317–318, 92 S.Ct. at page 2137 the Court continued:

"The Fourth Amendment contemplates a prior judicial judgment, not the risk that executive discretion may be reasonably exercised. This judicial role accords with our basic constitutional doctrine. that individual freedoms will best be preserved through a separation of powers and division of functions among the different branches and levels of Government. . . . Prior review by a neutral and detached magistrate is the time-tested means of effectuating Fourth Amendment rights. *Beck v. Ohio,* 379

U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964)." (Footnote omitted.)

And finally at page 321, 92 S.Ct. at page 2139 the Court stated:

"A prior warrant establishes presumptive validity of the surveillance and will minimize the burden of justification in post-surveillance judicial review. By no means of least importance will be the reassurance of the public generally that indiscriminate wiretapping and bugging of law-abiding citizens cannot occur."

When the court order to intercept was granted in the present case, it was initially made clear to the Court, at a formal recorded hearing, that an "oral bug" would be required to be covertly placed within the subject premises. At that time no one had yet entered to explore the available alternatives nor had the specific type of technical device planned to be used been determined. (In-chambers Tr., Dec. 16, 1974, at 17–20).

In the case of *United States v. Dalia*, 426 F.Supp. 862 (D.N.J.1977), the court said:

"Once a showing of probable cause is made to support the issuance of a court order authorizing electronic surveillance, thereby sanctioning the serious intrusion caused by interception, implicit in the court's order is concomitant authorization for agents to covertly enter the premises in question and install the necessary equipment." At 866.

A forcible entry without a warrant occurred in the case of *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). There police officers gained entry to an apartment by the use of a passkey and conducted a search incident to an arrest. Narcotics which were seized in the course of this search were introduced at trial. Justice Clark, writing for four Justices, assumed that the use of a passkey was the equivalent of a breaking and entering, but noted that state law in that instance allowed unannounced forcible intrusions under exigent circumstances. He also acknowledged that the method of entry,

which was sanctioned by state law in that instance, was not unreasonable under the fourteenth amendment. *Id.* 374 U.S. at 41–43, 83 S.Ct. 1623.

Recently, in the Eighth Circuit case of *United States v. Agrusa,* 541 F.2d 690, 697–698 (8th Cir. 1976), it was held that:

"Business premises, while entitled to protection under the Fourth Amendment, are not entitled to the same protection which is afforded a home. *See v. Seattle,* 387 U.S. 541, 545–46, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Also, premises which are vacant at the time searched are, in respects here material, less protected constitutionally than are occupied premises. What authority there is holds that unannounced and forcible entries into vacant premises, even homes, in order to conduct a search, are constitutional in the absence of exigent circumstances, provided that the search and seizure is pursuant to warrant and reasonable under the circumstances. *Payne v. United States,* 508 F.2d 1391, 1394 (5th Cir. 1975), cert. denied, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975); *United States v. Gervato,* 474 F.2d 40 (3d Cir. 1973), *vacating* 340 F.Supp. 454 (E.D.Pa.1972), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973)."

While the precise situation is not repeated here, it is significant to note that, as in the *Agrusa* case, the premises involved in this case were not actually occupied at the time of the covert entries to implant the bug or connect up the wires. The target premises was not a home or a professional office; neither was it the situs of any legitimate business or other such activity; and that was a major factor considered by the Court. The evidence offered at the formal hearing indicated that the premises was in fact a beehive of unlawful and criminal gambling activity; nothing legitimate or lawful was going on there.

In a case [4] having some analogous facts, *United States v. Altese,* 75–CR–341 (E.D.

---

4. In addition to Mishler, C. J., this overall surveillance included two separate premises and successive approval orders signed by District Judges Judd, Bartels and Neaher, all upholding the same type of covert entry.

N.Y. Oct. 14, 1976), Chief Judge Mishler stated:

"[I]n response to Judge Bartels' inquiry, [Special Attorney Barlow] informed him of their plans to enter the lounge at night with a passkey in order to plant the bugging devices. The judge's question indicated his awareness of the inherent necessity to surreptitiously enter the premises to effectuate the court order.

"It is this court's position that once probable cause is shown to support the issuance of a court order authorizing electronic surveillance thereby sanctioning the serious intrusion caused by interception, there is implicit in the court's order, concomitant authorization for agents to covertly enter the premises and install the necessary equipment. The circumstances underlying the issuance of an intercept order is analogous to the issuance of a traditional search warrant. Both the intercept order and the search warrant serve to sanction intrusions otherwise constitutionally prohibited." Slip Op. at 52.

*See also United States v. Dalia,* 426 F.Supp. 862 (D.N.J.1977).

■ The Court finds that the affidavits submitted in support of the application for the original intercept order and its subsequent extension were sufficient to support a finding of probable cause, and therefore there was sufficient basis to authorize the covert entry.

(b) *Notice to Landlord and/or Custodian*

The defendants further assert that covert entries cannot be made onto premises of a landlord or custodian without actual notice to them or without a showing that such notice would jeopardize the investigation. This claim is totally without legal foundation. The applicable statute, 18 U.S.C. § 2518(4) states in relevant part:

"An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates."

■ Nothing in the statute requires that the applicant must request the assistance and cooperation of the common carrier, the landlord or the custodian. It is purely a discretionary assistance, which can be sought by court order. It is not a prerequisite to the authority granted. At no time did the government applicant request any such assistance here; therefore the law is not applicable. There is no requirement that special findings should be made by the Court in this respect.

*Failure to Name Potential Defendants In Original Interception Application*

The defendants claim that the Government failed to fulfill the statutory requirements of 18 U.S.C. §§ 2518(1)(b)(iv) and 2518(4)(a), in that it did not identify by name all of the prospective persons, whose conversations they had probable cause to anticipate would be likely to be intercepted. Among those whose names were not included was the defendant, Anthony D. Volpe. The applicable wiretap statutes read in part:

"(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . (iv) the identity of the person, if known, committing the offense and whose com-

munications are to be intercepted; . . . ."

and § 2518(4)(a) reads:

"Each order authorizing or approving the interception of any wire or oral communication shall specify—

(a) the identity of the person, if known, whose communications are to be intercepted."

The defendants' posture is that the failure of the Government to disclose the identity of the defendants Volpe or Chiarizio to the Court as being a part of the gambling business at the time the original application was made, is sufficient justification for the Court to order a suppression of the evidence relating to them and such other persons whose names were similarly omitted, pursuant to 18 U.S.C. § 2518(10)(a). They claim that the Government's alleged reckless misrepresentation, whether inadvertent or purposeful, cannot be excused as a mere technical violation; and in their brief they requested that this Court await a ruling by the Supreme Court in the *Donovan* case argued October 11, 1976.

The final decision in *United States v. Donovan*, 429 U.S. 413, 428, 439, 97 S.Ct. 658, 668, 674, 50 L.Ed.2d 652 (1977), the above mentioned case, laid to rest the issues raised here, when the Supreme Court said:

". . . A wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone.

"Although the Government was required to identify respondents . . . in the December 26 application for an extension of the initial intercept, failure to do so in the circumstances here presented did not warrant suppression under § 2518(10)(a)(i). Nor was suppression justified with respect to respondents . . . simply because the Government inadvertently omitted their names from the comprehensive list of all identifiable

persons whose conversations had been overheard."

*See also United States v. Kahn*, 415 U.S. 143, 155, 157, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); Supreme Court orders reported at 20 Cr.L.Rep. 4169 (Mar. 2, 1977), vacating judgment in *United States v. Bernstein*, — U.S. ——, 97 S.Ct. 1167, 51 L.Ed.2d 578; *United States v. Barletta*, 578 U.S. ——, 97 S.Ct. 1168, 51 L.Ed.2d 578; *United States v. Cabral*, 578 U.S. ——, 97 S.Ct. 1168, 51 L.Ed.2d 578; denial of certiorari, reported at 20 Cr.L.Rep. 4169 (Mar. 2, 1977), in *Anderson v. United States*, — U.S. ——, 97 S.Ct. 1172, 51 L.Ed.2d 580; *Malloway v. United States*, — U.S. 580, 97 S.Ct. 1173, 51 L.Ed.2d 580; *Doolittle v. United States*, — U.S. ——, 97 S.Ct. 1173, 51 L.Ed.2d 580.

The defendants Volpe and Chiarizio were both named in the renewal intercept order authorized by the Court on January 16, 1975. However, they were not included in the original government application on December 16, 1974, as primary users of the subject telephone at 103 New Britain Avenue. The factual circumstances are that Volpe operated a restaurant, The Place Cafe, at 107 New Britain Avenue, which was only a short distance down the street. Police surveillance observed Volpe using the telephone on occasion at 103 New Britain Avenue and once during the daytime he was observed using a door key to gain entrance. That, standing alone, would not justify a finding of probable cause that he was likely to be overheard. Although hindsight might now indicate Volpe's closer association with that premises, his limited usage of the subject telephone at the time the original application was filed with the Court does not justify a suppression of the evidence. Certainly it might be said that there existed suspicion about his conduct, because of the continuing interchange of regular patrons between his bar and the gambling location. Yet there was no tangible evidence at that time, to confirm with reasonable probability that Volpe and Chiarizio were operating together as business associates at that location. Both names were added, however, in the govern-

ment's renewal application on January 16, 1975 when it sought the extended order.

### Standing to Suppress

The defendants stress the fact that the United States Attorney General's letter of December 12, 1974, (Government Exhibit A–1), authorized an application to the Court for a wire interception to and from the telephone number 203–247–6309 at 103 New Britain Avenue, as well as oral interceptions from the same premises. They assert that the Court's authorization identified the 103 New Britain Avenue location, as the sole target of the surveillance interception. The suppression evidence revealed that not only did the federal agents covertly enter the store front at 103 New Britain Avenue pursuant to the court's order, but they also entered the common basement of the building housing that location. The latter entry was made through a side door entrance leading to the cellar area, from 11 Julius Street and then through the adjoining space under 101 New Britain Avenue, connecting ultimately into the basement space underneath 103 New Britain Avenue. The defendants represent that the court's original order did not specifically authorize access entry into 11 Julius Street as a means to enter the basement area. However, the Court subsequently did require that address to be included in the second application, when the extension order of January 16, 1975 was granted. At the chambers hearing on December 19, 1974, Agent Santacroce did explain to the Court the relationship of 11 Julius Street to the building basement and the need to use it as a means of access. (In-chambers Tr., Dec. 19, 1974, at 5–9).

■ None of the defendants participating in this motion to suppress have asserted any inherent possessory rights under their lease in the basement area, or in 11 Julius Street, 101 New Britain Avenue or even the basement area underneath 103 New Britain Avenue. No covert entry was made into the caged-in storage area of 99 New Britain Avenue. Absent any showing of a proprietary or possessory interest in the premises entered, a defendant has no standing to object to the ultimate fruits of such an entry. Since no such interest has been asserted here, the Court concludes that none existed.

The Second Circuit Court of Appeals recently considered "interest in the premises" a prerequisite in order to successfully make a fourth amendment claim. In the case of *United States v. Galante*, 547 F.2d 733 (2d Cir. 1976) the Court said:

"This case falls squarely within the holding of *Brown*. The petitioners in that case were charged with transportation of stolen goods in interstate commerce and conspiracy to commit that crime. The stolen goods were recovered from a warehouse owned by a co-conspirator. There was no question that the search of the warehouse did not comport with the Fourth Amendment. In holding that the appellants lacked standing to raise the Fourth Amendment claim, Chief Justice Burger wrote:

In deciding this case, therefore, it is sufficient to hold that there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." at 737.

*See. Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *Simmons v. United States*, 390 U.S. 377, 391–394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); and *United States v. Romano*, 330 F.2d 566, 569 (2d Cir. 1964), *cert. denied*, 380 U.S. 942, 85 S.Ct. 1020, 13 L.Ed.2d 961, *rehearing denied* 381 U.S. 921, 85 S.Ct. 1530, 14 L.Ed.2d 441 (1965).

■ The Court finds that the defendants lack the requisite standing, both under Title III and under the fourth amendment, to challenge the Government's entries into the basement area of 103 New Britain Avenue

and into the access area leading from 11 Julius Street, or to challenge the permissive entry into the basement of the delicatessen at 99 New Britain Avenue.[5]

### Did The Government Fail To Show That Less Intrusive Measures Would Suffice?

The defendants argue that the wire interception connection could have been made at a multiple appearance in a telephone box located on an exterior telephone pole ( # 2602), located across the street and to the rear of 96 New Britain Avenue. (Defendants' Exhibit 6; Tr. 538–546). They concede that this box had no available spare facilities or vacancies on December 16, 1974, which could be used to connect the wiretap. (Tr. 558–559). However, they contend that it would have been a relatively simple procedure to create spaces or vacancies, and that this would not have created any interruption of service or caused any change in subscribers' telephone numbers. (Tr. 586). The procedure could have been undertaken by telephone personnel, the defendants assert.

According to the defendants, it was the government's Agent Puckett, a man with twenty-seven years of investigating experience, who advised the telephone company security representative on December 18, 1974, that it was not feasible to use pole # 2602, because in addition to the wiretap, it would be necessary to install an oral "bug"—to do this, he allegedly informed them, an exterior wire would have to be run from the basement of 103 New Britain Avenue, overhead across the street to pole # 2602. (Tr. 822–825).

The defendants further speculate that the Court might have denied permission for a covert entry, had it been made aware of the fact that the aforesaid telephone box appearances could have been modified to accommodate the wire intercept from without the premises, since the sole purpose for an entry in that case would have been to connect the oral interception microphone.

Agent Puckett explained that while a multiple appearance did exist on pole # 2602 for the target telephone line, a pair of "dry" metallic wires would have also been needed to connect the microphone at 103 New Britain Avenue with the pole, and none was available. "Dry" wires (i. e., wires appurtenant to a normal telephone line which do not carry telephone messages and which do not pass through a transformer) would have been needed, because the oral interception device emplanted in 103 New Britain Avenue was operated by means of a remote power supply, located at the government receiving office. The listening device would not function on the 48-volt current used in standard telephone transmission, and would be incompatible with telephone transformer equipment. (Tr. 836–839).

Agent Puckett asked telephone Security Officer O'Connor if a "dry" connection could be made from pole # 2602, and he was told that such a connection was not possible, because all the circuits on that pole were occupied. (Tr. 558). O'Connor was a responsible and technically knowledgeable telephone company employee. (Tr. 840–843). While O'Connor did vacillate somewhat at the suppression hearing,[6] the

5. See note 3, supra.

6. At the evidentiary hearing, John O'Connor of Southern New England Telephone Company, testified that, because of discussions with the Government prior to December 19, 1974, he checked the phone company records regarding the feasibility of using a pole behind 96 New Britain Avenue to implement the electronic surveillance. (Tr. 556–558). He determined that the pole could not be used. (Tr. 559, 568, 569, 579). He testified that all other means of implementing the order had been exhausted on the 17th and 18th. (Tr. 589–590). (Mr. O'Connor could not recall if he had ever told the FBI

about the pole prior to December 19). (Tr. 601, 606–607). On the 19th he offered the FBI the alternative of the phone company running a line between the box under 99 New Britain Avenue and the other box in the basement. (Tr. 609, 638–639). He testified that the pole was not discussed because he had already ruled it out. (Tr. 609–610). Mr. O'Connor's testimony was somewhat contradictory since at one point he stated that the FBI had told him that the pole could not be used. (Tr. 611, but see 636). He also testified that, in his judgment, the second circuit could not have utilized the

present concern is solely with the representations he made at the time here in question.

Eventually, the oral intercept device was connected through a "dry" circuit with appearances in the telephone box located in the common basement at 101 New Britain Avenue, which had been connected with the box in the enclosure underneath John's Delicatessen (99 New Britain Avenue). At the hearing, it was first learned from O'Connor that circuits might in fact have been freed on pole # 2602. However, this would have required the installation of a connecting wire over and across the roadway, which might well have alerted the suspects to the surveillance. (Tr. 656). In addition, freeing up circuits on pole # 2602 would have required shifting working wires out of the box on the pole to free up necessary binding-posts. This procedure could in turn have necessitated cable transfers, shifting loops, and plant wiring changes. (Tr. 586). Furthermore, even if all this was done, no evidence was presented to suggest that a "dry" circuit was available on pole # 2602, separate and apart from normal circuits carrying telephone signals.

██ The defendants' purely speculative hindsight argument—that the Court might have required the wiretap to be undertaken by engineering changes on pole # 2602, had it been fully informed of the facts—is not credible. This proffered conclusion relies on the use of information that was not available at the time of the decisionmaking in question. In addition, with the target premises known to be using "total telephone service," in which incoming calls were being transferred and re-transferred to unknown receivers, oral interception appeared essential to the accomplishment of an effective surveillance. The Court finds from the special facts of this case that a

valid public interest justified the intrusion and that probable cause was shown to exist.

*Request for Suppression for Failure to Disclose to the Court a 1972 State Wiretap Involving One of the Defendants and Premises at 103 New Britain Avenue*

The defendants demand that the evidence obtained from the electronic surveillance should be suppressed, because Agent Santacroce's December 16, 1974 affidavit did not inform the Court of a previous state wiretap involving the defendant Michael O'Brien and the 103 New Britain Avenue premises. Title 18 U.S.C. § 2518(1)(e) provides in part:

"(1) Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

. . . . .

"(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application;"

The verified application of December 16, 1974 presented to the Court by the special prosecutor for authority to make this interception, represented in paragraph five that no previous application had been made to any judge requesting authority to intercept wire or oral communications involving any of the same persons, facilities, or places specified therein, except as indicated in the

---

pole. (Tr. 625–627). Attorney Paul E. Coffey testified that prior to the 19th the possibility of using the pole had been considered, but based on information supplied by the phone company, it was concluded that the pole could not be used. (Tr. 732). Agent Puckett testified that he became aware of the existence of the pole on December 17th. (Tr. 820). Puckett testified

that *he was told* by Jack O'Connor that an engineering problem eliminated the use of the pole. (Tr. 821–822, 830–832, 834, 835, 840). He also testified that it would have been impossible to have connected the oral device to the box on the pole (Tr. 822–823, 824, 841), although he would have preferred doing it this way. (Tr. 834).

attached affidavit of Special Agent Santacroce.

The latter's affidavit was incorporated as an integral part of the application and it indicated that on March 22, 1973, United States District Judge Blumenfeld had previously authorized a wire interception on the telephone to a third party. This surveillance revealed conversations concerning an illegal gambling business being conducted by Michael Chiarizio and others, including the defendant, Michael T. O'Brien. He further represented that on November 11, 1971, Judge Blumenfeld authorized similar interceptions to and from telephones listed to J. E. Ahearn, Rene Sapere and "The Sapere children," all of which were in service at the residence of Emil Sapere; and from other telephones listed in the names of Mary, Vincent and Dominic Sapere. It was also represented that during the course of such interceptions the defendant John X. LeConche was an overheard participant. The agent further stated that there was no reason to believe that any of the aforesaid individuals, other than John X. LeConche and Michael T. O'Brien, would be likely to be monitored in oral or wire interceptions in this instance at 103 New Britain Avenue, Hartford, Connecticut.

The affidavit of Agent Santacroce went on to state that on February 23, 1973, Judge Blumenfeld had authorized interceptions of wire communications at the telephone of one Robert Dover, and that Michael Chiarizio was monitored in gambling conversations with one Joseph Tedesco. He further represented that on May 8, 1973, said Judge had authorized interceptions on the telephones of Angelo DeSena in New Britain and Charles Shaefer in Southington. These interceptions revealed numerous gambling conversations between Michael Chiarizio, Angelo DeSena, Jack Shaefer and other individuals involving an illegal gambling business being conducted over the telephone.

After advising the Court of the known prior wire interceptions, in accordance with the provisions of 18 U.S.C. § 2518(1)(e), Agent Santacroce further testified that the representations in his affidavit relied on none of the information obtained from any of the prior wire interceptions. (In-chambers Tr., Dec. 16, 1974, at 10–16). His testimony and the general discussion in the formally recorded in-chambers hearing revealed that the agent was fully aware of his statutory obligation to disclose to the Court all known previous applications and he was making a good faith effort to do so.

During the suppression hearing, evidence was adduced to the effect that the defendant O'Brien and the premises at 103 New Britain Avenue had in fact been the subject of a prior wiretap in September 1972. (Defendants' Exhibit 8; In-chambers Tr., Dec. 16, 1974, at 15–16). State law enforcement representatives testified that no information concerning the existence of the state wiretap was ever disseminated to the federal government. In fact, state law would prohibit such dissemination. (Tr. 368, 406–409, 417, 419, 675–676). See United States v. Sapere, 531 F.2d 63 (2d Cir. 1976).

Hartford City Police Captain Sullivan, who had assisted the state officers prior to the implementation of the 1972 wiretap, testified that he was never told by the state authorities as to whether or not that state tap had actually occurred. (Tr. 400, 419, 424–426). The same officer worked with Special Agent Santacroce in the investigation of this case. (Tr. 429). He stated that although he subsequently concluded, in December of 1972, that there had been a wiretap (Tr. 428), he never discussed the matter with Agent Santacroce or any other federal agent. (Tr. 432–433, 682–683). The city police officer conceded his own lack of personal knowledge that the federal law required disclosure of all prior interception applications. (Tr. 683).

Special FBI Agent Ludwig had also worked with Santacroce on this investigation. He stated that in 1972 he had clipped a newspaper article from the Hartford Courant concerning the state arrests stemming from that state court wire interception, which included the name of the present defendant Michael T. O'Brien. He had sent this clipping to the FBI office in

New Haven, where it was placed in a folder concerning one Jacob Schneider. (Government Exhibit 5; Tr. 799–801). He testified that he had never discussed the article with Agent Santacroce, nor was he ever informed by any state source of the existence of the tap or its contents. (Tr. 803–815).

Ludwig testified that he had participated with Agent Santacroce in a 1973 interview with Michael O'Brien, when they were investigating an "electronic bug" found in the telephone of O'Brien's lady friend. (Government Exhibit 9). During that investigation, O'Brien explained to them that it may have been placed there by the State Police, because they had previously arrested him for matters arising from a wiretap. (Tr. 804).

Agent Santacroce testified that he knew of the state arrests, but not of the state wiretap. (Tr. 95, 710–711, 712). He stated that he had searched the O'Brien file in preparing his affidavit and had seen no newspaper clippings referring to a state wiretap. (Tr. 711). During the suppression hearing, at the request of the Court, Agent Santacroce searched the FBI files in New Haven and found the article clipped by Agent Ludwig in the file of Jack Schneider. (Tr. 747). He stated that prior to his executing the December 16, 1974 wiretap affidavit, he had no reason to believe that such a newspaper clipping existed in the Schneider file. (Tr. 748). It should be noted that while the article mentioned O'Brien, it gave his address as 100 Bond Street, not 103 New Britain Avenue. (Government Exhibit 5; Tr. 749). Agent Santacroce stated that he would have included information on the state tap if he were conscious of its existence. (Tr. 712–713, 754–755).

Agent Santacroce testified that in reviewing the New Haven FBI files, he had found a report of the interview with Michael O'Brien, in a file marked "unknown subject," in which O'Brien had made reference to having been arrested as a result of a state wiretap. The interview had occurred on September 10, 1973. (Defendants' Exhibit 9). Agent Santacroce stated that he had probably looked at the report while reviewing files prior to his affidavit of December 16, 1974, but had missed the reference to a wiretap. (Tr. 775, 776). He explained that he had simply forgotten about the interview by the time the application for electronic surveillance was made to the Court. (Tr. 774–775).

The Court finds that Agent Santacroce's testimony was open, truthful, and made with a good faith belief that the prior wire interceptions revealed in his affidavit were the only ones of which he was aware, relating to the named subjects or the location 103 New Britain Avenue. The Court finds that under all the circumstances there was no knowing or reckless misstatement made to the Court by him and that he had made a good faith compliance with the provisions of 18 U.S.C. § 2518(1)(e). That statute spells out disclosure requirements which are analogous to and comparable with the constitutional basis for the issuance of a valid search warrant.

In a recent case in this Circuit, *Kahn v. Flood*, 550 F.2d 784 (2d Cir., 1977), the Court said:

"Petitioners contend that they were denied a 'full and fair' hearing in the state courts because of the New York rule which requires a demonstration of perjurious statement by the affiant, a rule allegedly more restrictive than that which obtains in federal court. *On the contrary, it is clear that neither jurisdiction would invalidate the warrant without some showing of an affiant's knowing misstatement.*"

.        .        .        .        .

"Accord, *United States ex rel DeRosa v. LaVallee*, 406 F.2d 807, 808 (2d Cir.), cert. denied, 396 U.S. 854, 90 S.Ct. 115, 24 L.Ed.2d 103 (1969) (probable cause determined upon information furnished issuing magistrate unless materially false 'to the knowledge of the affiant'); *United States v. Perry*, 380 F.2d 356, 358 (2d Cir.), cert. denied 389 U.S. 943, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967) (probable cause established if facts alleged establish illegality if true and affiant has reasonable grounds for believing them true; accura-

cy of informant's information 'not relevant')." At 785–786 (emphasis added, footnote omitted).

See also *United States v. Sultan*, 463 F.2d 1066, 1070 (2d Cir. 1972); *United States v. Perry*, 380 F.2d 356, 358 (2d Cir. 1967).

■ The information which the defendants claim Agent Santacroce failed to disclose, would not have affected the Court's decision to grant the wire and oral intercepts. If anything, it would in all probability have provided supplemental reasons for granting the Court's ultimate action.

### Overbreadth of Judicial Order

The defendants represent that the Court's original intercept order of December 16, 1974, did not adequately restrict and define the permissible methods and procedures for entering into the subject premises. They claim that the order should have set out specific guidelines and limitations on the number and type of entries, so as to properly restrain the government agents in the performance of their duties. They also allege that the order failed to provide the kind of close judicial supervision or protective procedures over the installation, maintenance and removal of the electronic device, which Congress contemplated under the statute. The defendants cite as precedent *United States v. Ford*, 553 F.2d 146 (D.C.Cir. 1977), which affirmed the suppression order granted in 414 F.Supp. 879 (D.C. Cir. 1976). In *Ford*, the court found among other things that the intercept order failed to obtain court approval in advance of each intrusion, and no affidavit or transcript of oral evidence of the in-chambers hearing was available for the court to review, to supplement what was contained within the corners of the order per se.

In weighing the circumstances of that case, however, it must be borne in mind that there exists a crucial difference between the procedures in this case and in *Ford v. United States, supra*. In this case, all communications between government counsel, the FBI agent witnesses, and the Court itself, are a matter of formally recorded transcript and are available for appellate review and scrutiny. Illustrative of the *Ford* case's record deficiency, the District Court said:

"The Assistant U.S. Attorney attempts to avoid the consequences of this overbreadth by making a proffer to the effect that the Judge in fact approved each entry in advance and knew that contrary to the broad terms of the warrant the police were planning to enter at a reasonable time, for valid reasons each time and by what appears to be a wholly proper ruse. As already indicated, the Court is satisfied that these representations are correct. The difficulty, however, is that the Assistant's discussions with the Judge on which he bases his representations were not transcribed or presented by affidavits. *Thus a formal record is wholly lacking and, as a practical matter, there is no supporting record to review.* Under these circumstances the warrant as written is binding and exclusive . . .. Moreover, the approach used by the Judge here is inconsistent with the congressional intent as to the proper procedures to be followed, see Sen.Rep.No.90–1097, 90th Cong., 2d Sess. 102 (1968) ('[18 U.S.C. § 2518(2)] provides that the judge may require the applicant to furnish additional testimony or documentary evidence in support of the application. The additional testimony need not be in writing, but it shall be under oath or affirmation and a suitable record should be made of it. The use of a court reporter would be the best practice.')" 414 F.Supp. at 884–885 (emphasis added).

When the Court authorized the first wire and oral interceptions, it was made known to the Court on the hearing record, (In-chambers Tr., Dec. 16, 1974, at 17–20; Government Exhibit B), that the procedures to be used would require a covert physical intrusion into the street floor premises at 103 New Britain Avenue to emplant the microphone device within the four walls of establishment for subsequent connection to the circuit box in the basement. The original entry into the premises was accomplished in the early morning hours of De-

cember 17, 1974, by using a passkey, and the bug-device was concealed alongside the hot water pipe running to the radiator through an existing hole in the floor to the basement of 103 New Britain Avenue. (Tr. 240). The connecting wire was retrieved by other agents, who had entered the basement area from 11 Julius Street in order to connect it with the leased circuits of the telephone company.

■ The Court will first discuss judicial supervision of the renewed interception, because of the factual simplicity of its related events. When the court order reinstituted the wire and oral interception on January 16, 1975, it provided for termination within 15 days. To carry out its objectives, no additional entry was required to be made into the store front at 103 New Britain Avenue, because the reconnect action required access only from 11 Julius Street; and later, when the disconnect occurred on January 29, 1975, it was accomplished by going through the same basement area and pulling the wired "bug" through the hole in the floor to the basement underneath. The second wire and oral intercept order required no special permission or supervision beyond the warrant itself, to enter the premises at 103 New Britain Avenue; and, as the Court has found *supra*, the defendants have no legal standing to challenge the entry into 11 Julius Street. It is a reasonable inference to conclude that the intrusion to install the device required a similar intrusion to withdraw it.

When the initial installation of the microphone was accomplished in the premises at 103 New Britain Avenue, the agents entered with a passkey in the early morning hours of December 17, 1974, to make a preliminary survey and find a suitable location to place the device and make it operable. Subsequently in the early hours of the 18th, an agent used a skeleton key (Tr. 303–304), to enter 11 Julius Street, which lead to the general basement area underneath 101–103 New Britain Avenue to connect up the wiretap and the oral "bug." (Tr. 309–310).

However, the telephone company's information as to the location of the box containing the proper terminals proved to be inaccurate. There was one box in the cellar of # 101; but the correct box with the proper appearances and connecting terminals was actually under 99 New Britain Avenue. That area was shielded by a strong wired-in enclosure that housed the cellar storage compartment assigned to John's Delicatessen. On December 19, 1974, an in-chambers hearing was held, wherein the Government asked the Court for permission to extend their authority to covertly enter the "Deli premises" at 99 New Britain Avenue after business hours, in order to connect up that box with the box under # 101 with leased wires for the telephone and the "bug." The Court declined to authorize this intrusion into the delicatessen premises after hours and suggested that other means be found.

At about 2:00 p. m. on December 19th, the government agent on his own initiative and accompanied by a telephone repairman, entered John's Delicatessen. The repairman said to the proprietor, "We would like to go to the telephone equipment in the basement." He responded "Okay," and pointed to the door. The government agent did not introduce himself or tell "John" that he was an FBI agent. He did not make any affirmative representations, nor was he dressed in any uniform. He went with the telephone repairman directly to the wire caged area in the basement. John came down soon afterward, at which time he opened the wire mesh door leading from the caged area at # 99 out into the open basement. After the repairman had connected up the proper wiring circuits from the box in the caged area under # 99 to the box in the outer cellar at # 101, the agent and the repairman exited through the street level door at 99 New Britain Avenue. (Tr. 257–259).

■ The Court finds that the strategies used, although unethical, were carried out with the tacit approval of the proprietor of the delicatessen. In any event, it was not carried out as an "after hours" entry, which

the Court had refused to authorize; and it did not violate the court's order. Finally the defendants have demonstrated no legal standing to challenge this permissive entry at 99 New Britain Avenue for the reasons hereinbefore set out, *supra.*

Pursuant to the first surveillance order, on the evening of December 19, 1974 at about 9 to 10 p. m., an agent returned to the basement of # 101, through 11 Julius Street, where he hooked up the microphone and connected the leased circuit to the terminal of 247–6309 to make it operable. (Tr. 261).

On December 20, 1974, the microphone was not functioning properly and the agent again entered the basement through 11 Julius Street, and to the area underneath 103 New Britain Avenue, where he replaced the wire connecting the microphone and the terminal block housing the leased wires under # 101. (Tr. 265). No one entered thereafter, until December 30, 1974, when the agent entered through Julius Street to the area under 101 New Britain Avenue, to disconnect the terminals. (Tr. 267).

The defendants claim that the agent's alleged permissive entry with the approval of the proprietor into the basement of "John's Deli," at 99 New Britain Avenue, constituted an unlawful intrusion and a trespass, which invalidated the subsequent interception, because it was accomplished through fraud and deception. The Court finds that the telephone repairman, was an employee and agent of the telephone company and the latter was acting under the court order to provide assistance to the Government. No oral affirmative misrepresentation was made by anyone in order to gain access to the telephone box inside the caged-in area of the basement at 99 New Britain Avenue.

In the landmark case of *Olmstead v. United States,* 277 U.S. 438, 468, 48 S.Ct. 564, 568–569, 72 L.Ed. 944 (1928), Chief Justice Taft said,

"Nor can we, . . . subscribe to the suggestion that the courts have a discretion to exclude evidence, the admission of which is not unconstitutional, be-
cause unethically secured. . . . There is no case that sustains, nor any recognized textbook that gives color to such a view. Our general experience shows that much evidence has always been receivable although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oath-bound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths and given themselves every appearance of active members engaged in the promotion of crimes, for the purpose of securing evidence. Evidence secured by such means has always been received."

*Also see Ponce v. Craven,* 409 F.2d 621, 626 (9th Cir. 1969).

*Did the Government's Affidavit Establish That Other Means of Surveillance Were Unlikely to Succeed?*

The federal law defines the operation of illegal gambling businesses under 18 U.S.C. § 1955(b) and (c), stating in relevant part:

"(b) As used in this section—

(1) 'illegal gambling business' means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

. . . . .

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives

gross revenue in excess of $2,000 in any single day shall be deemed to have been established."

Pursuant thereto, 18 U.S.C. § 2518(1)(c), the enforcement statute relating to wire and oral interceptions sets out the prerequisites for the obtaining of a judicial order and states:

"Each application shall include the following information:

.        .        .        .        .

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be dangerous;"

The affidavit of December 16, 1974 was sufficient to conclusively demonstrate to this Court, that the use of standard investigative techniques, other than wire or oral intercept, would be unlikely to succeed. The affidavit summarized the continued physical surveillance by the police between August and December of 1974. (In-chambers Tr., Dec. 16, 1974, at 5–31). While ordinary searches might lead to the arrest of certain bookies for making individual sales, the full nature of the operation with the placement of bets and the collection of indebtedness would not be uncovered. The local police had searched the premises twice with unsatisfactory results. Grand Jury techniques would not be successful because the informants refused to testify, out of a real fear of physical harm. The immunization of witnesses was not likely to uncover the scope of the gambling operation and would be likely to abort the investigation. The suspects were cautious, and were known to have taken steps to avoid detection; total telephone service was in effect, by means of which phone calls could be automatically switched to unknown destinations; and the use of toll call records would not be productive, because calls were generally not being made outside of the non-toll call area. Undercover agents would not be likely to gain the confidence of the participants in the operation to determine its true scope of the inside financing and management. (Affidavit, Agent Santacroce, at 33–

34). All of the aforesaid information was adequately set out in much detail and supported by the oral testimony of Agent Santacroce at the December 16, 1974 recorded chambers hearing. The latter agent is generally recognized to be a most reliable investigator, with 21 years of general experience in the FBI and 5–6 years of "street experience" in this type of gambling operation.

In this Circuit the Court has prescribed a realistic application of the federal wiretap statute in *United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir. 1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976), the Court said,

"Although the affidavit provides little factual basis for concluding that normal investigative techniques had not 'suffice[d]' to expose the crime,' . . . paragraphs (1)(c) and (3)(c) of § 2518 are in the disjunctive; and the Government's main reliance is upon the second alternative provided by the statute. We must view the affidavit as a whole and 'in a practical and commonsense fashion,' . . . .

"When one endeavors to prove a negative, it is difficult to be very specific about it; and we are loathe to set impossibly burdensome standards.

"We are satisfied that the Government has substantially complied with the statutory mandate, and we note that on oral argument appellants could advance no logical alternative to wiretapping . . . . . Indeed, *wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation.*" (Citations omitted; emphasis added).

*See also United States v. Schwartz,* 535 F.2d 160 at 163–164 (2d Cir. 1976); *United States v. Hinton,* 543 F.2d 1002 at 1011 (2d Cir. 1976); *United States v. Dalia,* 426 F.Supp. 862 (D.N.J.1977); *United States v. Vento,* 533 F.2d 838, 850 (3d Cir. 1976).

The legislative history of 18 U.S.C. § 2518(1)(c) and (3)(c) also supports and strengthens the Government's posture:

"Subparagraph (c) requires a full and complete statement as to whether or not normal investigative procedures have been tried and have failed or why these are unlikely to succeed if tried, or to be too dangerous. . . . The judgment would involve a consideration of all the facts and circumstances. . . . Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. . . . What the provision envisions is that the showing be tested in a practical and common-sense fashion." S.Rep.No.1097, 90th Cong., 2d Session (1968), *reprinted in* U.S. Code Cong. & Adm.News pp. 2112, 2190.

In a recent analogous case the Eighth Circuit in *United States v. Matya,* 541 F.2d 741 (8th Cir. 1976), said:

"As noted above, the affidavit revealed six months of prior investigative activity in this case, all of which had failed to reveal the scope of operations or the identity of individuals involved. *United States v. Kalustian,* 529 F.2d 585, (17 CrL 2428) (9th Cir. 1975), relied upon by defendants, is thus inapposite. As we noted in *United States v. Daly,* 535 F.2d 434, 439 n. 4 (8th Cir. 1976):

"In *Kalustian,* alternative means of investigation were discarded because "knowledge and experience" in investigating other gambling cases convinced government agents that normal techniques were unlikely to succeed. . . . *But see United States v. Steinberg,* 525 F.2d 1126, 1130 (2d Cir. 1975), [*cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976)]. The court in *Kalustian* ordered the evidence suppressed because the alternative means were given little opportunity to succeed. As discussed above, government agents used alternative means in this case. Inspector Olk's affidavits explain why those investigative techniques were inadequate.

"Government agents also used alternative means in this case, and, as explained below, the affidavit adequately set forth why they were inadequate. Thus, whatever our view of the *Kalustian* holding

may be, and we need not address that question here, the simple fact is that '[c]ourts have upheld authorizations based on applications that combine statements about general investigative experience in the type of crime and the particular facts of the case at hand.' *United States v. Vento,* 533 F.2d 838, 850 n.19, (19 CrL 2102) (3d Cir. 1976). And, despite defendants' statement to the contrary, even the Ninth Circuit, which authored *Kalustian,* apparently shares this view. See *United States v. Kerrigan,* 514 F.2d 35, 38 (9th Cir. 1975). Accordingly, the mere fact that the affidavit before is rested in *part* on statements that would be equally applicable to almost any gambling case does not render the affidavit insufficient.

· · · · ·

"Again in *Daly,* we explained that Congress did not require the exhaustion of 'specific' or 'all possible' investigative techniques before a wiretap order issues. 'Congress prohibited wiretapping only when normal investigative techniques are likely to succeed and are not too dangerous.' Sections 2518(1)(c) and (3)(c) were enacted to ensure that government does not routinely resort to wiretapping."

The defendants offered testimony through ATF Agent Comforti, claiming that he and four other agents had placed individual bets with certain of the named defendants as a part of his agency's independent investigation, and that if he could do that, it was proof that the gambling business could have been infiltrated and informants used to effect a successful prosecution, without the need for a wire or oral interception.

While the ATF agent testified that he had met the defendant O'Brien in August 1975, (Tr. 454), and had placed bets with him on several occasions, (Tr. 461), he believed that there were five or more people involved and that the operation was in business for more than 30 days, but he did not know the gross revenue in a single day. He knew several of the defendants with whom he placed separate bets, but he did not

know whether or not they were in business with O'Brien, (Tr. 465), because several were in business on their own.

When pressed to say if he could determine whether or not there were five or more persons in this gambling operation at 103 New Britain Avenue, who conducted, financed, managed, supervised, directed or owned all or part of the business, Agent Comforti responded, "I could say that one could fit that category, Mr. O'Brien." He testified that O'Brien had offered to pay him a percentage of any bets he could bring in to him. (Tr. 502–503). Furthermore, the telephone number given to him, where he might place bets with O'Brien was 247–0177, a number different from the phone on the above premises.

The ATF agent confirmed that there existed a one-way mirror at the entrance to the premises and that a glass-topped table was used with a grease pen to record bets taken over the telephone. (Tr. 508). On some occasions, the outer door was locked and on other occasions it was left unlocked. (Tr. 509).

It is of special note and significance here, that much of the foregoing conduct described by the ATF agent occurred after the first inventory order (relating to the wire and oral interception order of December 16, 1974) was signed by the Court, on March 25, 1975, with the order that inventory letters be sent to persons intercepted. The second inventory order was signed the same date and the letters mailed a few days later. When Agent Comforti made his observations, the climate had changed. The defendants had little more to lose, having already been alerted to the existence of the wire and oral interceptions. (Tr. 515).

■ Agent Comforti was frank to admit, that except for the specific identity of four people with whom he placed bets to establish the crime of accepting wagers without paying an occupational tax, his observations and information did not encompass the required evidence to successfully prosecute a Title 18 U.S.C. § 1955 violation. (Tr. 520–523). None of the information procured by the ATF agent was exchanged or passed on to any other federal law enforcement agency. (Tr. 527). The Court has concluded that from the nature of the evidence obtained by the ATF agent, the likelihood of a successful § 1955 criminal prosecution could not have been achieved by the infiltration process.

■ The Court finds that Agent Santacroce's affidavit of December 16, 1974 was sufficient, together with his oral testimony, to establish probable cause for the court's intercept order and a finding that other investigative procedures have been tried and failed and that it reasonably appears that such other procedures were unlikely to succeed if tried.

### Was Pen Register Invalid As Too Broad a General Search?

The defendants claim that the use of the pen register was improperly authorized, because the authority for its use was unconstitutionally broad; and that it permitted too extensive and general a search, in violation of the fourth amendment. Actually the order which authorized the use of a pen register was based upon the same factual proof of probable cause, as was the order permitting the wire and oral interceptions.

The Second Circuit recently held, in *In the Matter of an Order Authorizing the Use of a Pen Register or Similar Mechanical Device*, 538 F.2d 956, 959, 960 (2d Cir. 1976), that upon a satisfactory showing of probable cause the use of a pen register is permissible. The court said,

"We take this statement to mean that a pen register order involves a search and seizure under the Fourth Amendment, and that a court may issue such an order only upon a showing of probable cause.

.    .    .    .    .

"In our view, the power to order pen register surveillance, whether considered a logical derivative of Rule 41 or a matter of inherent judicial authority, is the equivalent of the power to order a search warrant, and is thus subject to the requirements of the Fourth Amendment."

In a similar case, *United States v. Lanza,* 341 F.Supp. 405, 422 (M.D.Fla.1972), the court set out the issue very clearly, when it said:

"Defendants also argue that the use of the pen register is a general search since it seizes everything on the wire in violation of the Fourth Amendment. The Court does not agree. Both the pen register and the tape recorders are activated at the same time; both 'record' the dialing or ringing of the phone. After the call is placed, the tape recorder continues to intercept and the agents continue to monitor for the purpose of determining whether the conversation is pertinent. Meanwhile, the pen register has already automatically terminated its 'interception.' It recorded no more than the dialing or the ringing of the phone. If the limited monitoring of the tape recorder for minimization purposes is permissible under the statute and the Fourth Amendment, it is difficult to see how the even more limited interception by the pen register is not permissible."

Furthermore, in *United States v. Giordano,* 416 U.S. 505, 553–554, 94 S.Ct. 1820, 1845, 40 L.Ed.2d 341, the Supreme Court said,

"Because a pen register device is not subject to the provisions of Title III, the permissibility of its use by law enforcement authorities depends entirely on compliance with the constitutional requirements of the Fourth Amendment." (Footnote omitted).

■ This pen register here was authorized at the same time as the wire and oral intercept order. Both were issued on the same factual findings. The Court has already found that probable cause was proven to justify the intercept order; therefore, logic and common sense demands that the pen register order also was founded on probable cause.

Finally, it should be noted, that the rule of law applicable to the suppression of evidence in this case on the issue of the monitors not minimizing the interceptions, as required by 18 U.S.C. § 2518(5), was ruled upon by Judge Blumenfeld in *United States v. Barone,* Crim. No. H–75–123 (D.Conn. July 9, 1976). His findings and ruling are adopted and incorporated herein by reference and made a part hereof.

The Court finds that the wire and oral communications seized under the court's orders of December 16, 1974 and January 16, 1975, respectively, were intercepted with the authority of properly issued and suitably circumscribed warrants. While courts generally regard such wire and oral interceptions as extraordinary action, the fact remains that Congress has authorized the Attorney General of the United States to follow this procedure in suitable cases, in order to effectively combat organized crime. The Court finds that under the special facts and circumstances of this case, the Government's action was justified; and the Court denies the defendants' consolidated motions to suppress the evidence flowing from the intercepted conversations. SO ORDERED.