UNITED STATES of America, Plaintiff,

v.

Lawrence DALIA and Daniel Rizzo, Defendants.

Crim. No. 75–488.

United States District Court,
D. New Jersey.

Jan. 11, 1977.

Jonathan L. Goldstein, U.S. Atty., by James M. Deichert, Sp. Atty., U.S. Dept. of Justice, Newark, N.J., for plaintiff.

Louis Ruprecht, Ruprecht & Graham, Newark, N.J., for defendants.

## OPINION

LACEY, District Judge.

By an application dated March 14, 1973 the United States Department of Justice requested and received authorization to in-tercept telephonic conversations emanating from two telephones located on the business premises of defendant Lawrence Dalia.[1] On April 5, 1973 the Justice Department sought and received an extension of their authority to intercept wire communications of Dalia and others, and, on the same date, authority was acquired to commence oral interception at Dalia's office. Subsequently, on April 27, 1973 the final request for an extension of its eavesdropping authority was approved by the court. As a result of these orders, wire interception devices were installed and did operate from March 15 to May 16, 1973, and an oral interception device was similarly installed and did operate between April 5 and May 16, 1973. The objective sought to be obtained by these interceptions was a determination of the scope of and participants in an alleged conspiracy involving theft from interstate shipments and interference with commerce.

An indictment charged this defendant with conspiracy and substantive crimes (18 U.S.C. §§ 371 and 2315) related to the theft and possession of an interstate shipment of textiles on or about April 3, 1973. On June 18, 1976 a jury verdict of guilty was returned.

In presenting its case against defendant Dalia, the government used the results of the aforementioned electronic surveillance. Defendant objected and moved to suppress the results of all illegal electronic surveillance and for an evidentiary hearing regarding the manner in which those oral and wire interceptions were accomplished. A post-trial evidentiary hearing was held on July 29, 1976.

In support of his motion, Dalia contends that those agents installing the device to intercept oral communications did unlawfully break and enter and trespass upon the premises of defendant, and by so doing did render any evidence obtained from that illegal entry inadmissible.

The bases for that contention are (1) that the government was required to seek judicial approval of an otherwise illegal break-

---

1. The application and authorization were made pursuant to 18 U.S.C. § 2516.

ing and entering for the purpose of installing an electronic eavesdropping device; (2) that such approval was neither sought nor obtained; and (3) that the use of evidence obtained from the oral interception device is contrary to the fourth amendment protection against unreasonable searches and seizures.

Defendant's second contention is that the progress reports submitted by the government for extensions of time for the wire surveillance were falsified and if the court had known, no extensions would have been allowed. His final contention is that the tapes should be suppressed because the government failed to adhere to minimization requirements.

Defendant preliminarily argues that the statements of the government, as well as its special agent, that normal investigative procedures reasonably appeared unlikely to succeed if tried, failed to satisfy the "full and complete statement" requirements of 18 U.S.C. § 2518(1)(c). The supporting affidavits submitted on April 5 and April 26, 1973, allegedly fell short of the elements enunciated by this court in *United States v. Falcone*, 364 F.Supp. 877, 889 (D.N.J.1973), aff'd, 505 F.2d 478 (3d Cir. 1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 482 (1975), in that the "applications for extensions offer very little toward a finding of the anticipated failure of standard methods of investigation." Defendant's Brief at 10. According to defendant, the government's sources could have verified the degree of involvement of defendant's co-conspirators and wiretapping was unnecessary. Additionally, it is argued, the agents, through wiretapping conversations pursuant to the original order, should have been able to pinpoint the locations or drops where stolen goods were stored so that continued eavesdropping was unnecessary.

In an application for a court-ordered electronic surveillance under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, *et seq.*, the government must present the court with a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

18 U.S.C. § 2518(1)(c). The court may then authorize the interception if it determines that

normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .

18 U.S.C. § 2518(3)(c).

■ The statutory burden on the government is not great in showing compliance with § 2518(3)(c) and the government "need not prove to a certainty that normal investigative techniques will not succeed, but rather need only show that such techniques 'reasonably appear to be unlikely to succeed if tried.'" *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

Sections 2518(1)(c) and (3)(c) must be read in a common sense fashion. S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S. Code Cong. & Ad.News 2112, 2190. *See also United States v. Armocida, supra*. They are designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974); *United States v. Robertson*, 504 F.2d 289, 293 (5th Cir. 1974), *cert. denied*, 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975). Their purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975).

■ I am in agreement with the Second Circuit in *United States v. Steinberg*, 525 F.2d 1126 (1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976) that "[w]hen one endeavors to prove a negative,

it is difficult to be very specific about it" and I am "loathe to set impossibly burdensome standards." *Id.* at 1130. *See also* *United States v. Falcone, supra,* 364 F.Supp. at 888–89; *United States v. Staino,* 358 F.Supp. 852, 856–57 (E.D.Pa.1973). I am satisfied that the government has substantially complied with the statutory mandate.

The three probable cause affidavits that Special Agent Hokenstad submitted to me were facially sufficient for me to make a determination that alternative investigative measures had either been tried and failed, *see United States v. Robertson, supra,* reasonably appeared unlikely to succeed if tried, *see United States v. Armocida, supra,* 515 F.2d at 38, or were too dangerous to be used. *Id.* Defendant's allegations as to pinpointing locations and the use of sources are not supported by affidavit or any other materials and are mere speculation.

Defendant next contends that an applicant for an interception order is expected to request the approval of the court to break and enter in order to install the electronic device. The court, it is asserted, did not therefore pass upon the question of whether the authorized surveillance could be accomplished in some lesser manner.

In support of this argument, defendant relies upon the holding in *United States v. Ford,* 414 F.Supp. 879 (D.D.C.1976). In that case the ruse of two bomb scares at defendant's premises was used to gain entry by the government. The warrant had stated that "entry and re-entry may be accomplished in any manner, including, but not limited to, breaking and entering or other surreptitious entry, or entry and re-entry by ruse and stratagem." *Id.* at 881–82. The court found the warrant to be invalid. It held that the issuing judge had a necessary role, under 18 U.S.C. § 2518(4), in determining the manner of entry and that this role had been wrongfully and without direction assigned to the executing officers. The warrant was found to be facially overbroad and illegal. *Id.* at 884–85.

Defendant also relies upon the dicta of the court in *United States v. Agrusa,* 541 F.2d 690 (8th Cir. 1976), where the court approved interception of wire and oral communications conducted by means of a forcible and surreptitious entry because there was prior judicial direction to the officers to break and enter. The court stated, however, that:

> we do not decide what result obtains if the officers act without express court authorization to break and enter (although with court authorization to intercept). We are certain, however, that the resolution becomes much more difficult in that event, and we commend the procedures employed here to law enforcement officials in the future.

*Id.* at 696 n.13.

Neither 18 U.S.C. § 2518(4), which specifies the necessary contents of a Title III authorization order, nor Rule 41(c) of the Federal Rules of Criminal Procedure, which indicates that a warrant must identify the property, and name or describe the person or place to be searched, requires the court to direct the manner of entry.

Because the warrant for the seizure of oral communications was based on probable cause, the question becomes whether or not the manner of executing the warrant was unreasonable.

The majority of cases concerning the manner of entry pursuant to a warrant are framed in terms of whether or not the manner of entry and/or execution of the warrant were so excessive as to be unreasonable under the fourth amendment.

Thus where real property is involved, there is the general requirement that officers must give notice of their authority and purpose and be refused entry before they may break into the premises to be searched. 18 U.S.C. § 3109. The general purposes of this requirement are to protect against unnecessary breaches of the peace, and prevent embarrassing sudden exposure of private activities. *See United States v. Bustamante-Gamez,* 488 F.2d 4, 11–12 (9th Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

In *United States v. Gervato,* 474 F.2d 40 (3d Cir.), *cert. denied,* 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973), the court held that there is also no requirement that the premises be occupied at the time of a search. In *Gervato,* the agent knew by surveillance that the premises were unoccupied. The agent forced open the door and conducted the authorized search. The court, in its analysis, outlined the history of the fourth amendment and indicated that its primary purpose was to put an end to general searches and warrants, i. e., to insure that the place and property to be seized were particularly described. *Id.* at 41–44.

It should be noted that there was no indication in *Gervato* that the agent should have received a court order to "break and enter" the premises.

The reasonableness of the manner of carrying out a search has also been considered in relation to body searches. Even in such searches involving intrusions into the human body, there is no requirement that prior judicial authorization be required. In *United States v. Mastberg,* 503 F.2d 465 (9th Cir. 1974), the court found that "real suspicion" and not independent judicial authorization is sufficient for a vaginal body-cavity search.

In *Rochin v. People of California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), it was held that stomach pumping evidence should be suppressed because it "shocked the conscience of the Court" and offended its source of decency and not because of lack of prior judicial authorization.

The affidavits which supported the application for the warrant in question indicated that resort to electronic surveillance, to overhear meetings at Dalia's office and conversations on Dalia's telephones, was required to identify the sources of Dalia's stolen goods, those working with him to transport and store stolen property, and the scope of the conspiracy. Oral evidence of this criminal enterprise was only available inside Dalia's business premises. On this set of facts, I find that the safest and most successful method of accomplishing the installation of the wiretapping device was

through breaking and entering the premises in question. Dalia in fact stated that, to the best of his knowledge, it would be impossible to install such a device in that location without gaining access to the building forcibly. Affidavit of Dalia at ¶ 4. In most cases the only form of installing such devices is through breaking and entering. The nature of the act is such that entry must be surreptitious and must not arouse suspicion, and the installation must be done without the knowledge of the residents or occupants.

 Once a showing of probable cause is made to support the issuance of a court order authorizing electronic surveillance, thereby sanctioning the serious intrusion caused by interception, implicit in the court's order is concomitant authorization for agents to covertly enter the premises in question and install the necessary equipment. *See United States v. Altese,* Crim. No. 75–341, slip op. at 52 (E.D.N.Y., filed Oct. 14, 1976). The court in *Altese* held that:

> Entry to install bugging devices is but a mere condition precedent that must necessarily be satisfied if the purpose behind an intercept order is to be effectuated. Entry to initiate surveillance is not another intrusion. Hence there need not be express authorization in the intercept order that issues for that prerequisite.

*Id.* at 53. I agree with this rationale and find that under these circumstances, notwithstanding the decision in *Ford,* it was not necessary for the government to obtain explicit judicial approval of an otherwise illegal breaking and entering for the purpose of installing an electronic eavesdropping device.

Defendant argues as a second basis for the suppression of the tapes that the two applications for extensions of the original wiretap order were legally and factually insufficient to justify continued electronic surveillance.

He first asserts that the objectives, outlined in the initial request of the government for permission to utilize electronic

surveillance, had been accomplished prior to the expiration of the original order and thus there was no reasonable need to continue the surveillance beyond April 5, 1976. In support of this contention, defendant, after reviewing the logs of the calls made during the three periods, states that the thrust of the government's case is premised almost entirely upon the conversations occurring during the initial wiretap period, and that conversations sought to be employed from the subsequent orders are of little probative value.

■ This rationale, however, is asserted only through the benefit of hindsight. I find that it is not unreasonable that the government, having gleaned certain information from wiretapping conversations pursuant to the original order, might assume that more information concerning the scope of the conspiracy might be forthcoming. On this basis, I find probable cause existed for the granting of extensions of the original wiretap order.

■ It is next argued that the progress reports submitted by the government to the court contained intentional misstatements "designed to create in the mind of the supervising court a belief that the wiretap, in its early days, was highly productive and justified continuation." Supplemental Memorandum of Defendant at 4. These misrepresentations allegedly invalidate the affidavits and the findings of probable cause.

The government conducted electronic surveillance on two separate phones utilized by the defendant in his business from March 14, 1973 until May 16, 1973. It also electronically intercepted office conversations through the use of a hidden microphone at the defendant's place of business from April 7 to May 16, 1973. There were over 5,000 intercepted telephone conversations which were recorded.

Each court-ordered electronic surveillance order directed the Department of Justice to furnish the court with a progress report on the fifth, tenth and fifteenth days of surveillance.

Larry A. Long, a special agent of the FBI, was responsible for the compilation of statistics used in preparing the progress reports which were requested by the court. He was the supervising agent for the compilation of statistics showing the minimizing of oral and telephone communications during the surveillance.

The procedure during the wiretapping was as follows. The monitoring agents would make handwritten entries in a log setting out the time of a given intercepted conversation, whether the conversation was overheard in its entirety or discontinued, and a very brief synopsis of the intercepted conversation. Other agents would review the tapes and prepare summary transcripts of the conversations. Long affidavit of July 29, 1976 at ¶¶ 1–3.

Douglas L. Hokenstad, a special agent of the FBI, was assigned "to act as agent in charge" of the investigation of Lawrence Dalia. Affidavit of Hokenstad at ¶ 1(a) and (b). He stated that:

> Each day [he] reviewed the handwritten logs prepared by the monitoring agents during the previous days' surveillance. [He] checked these logs to determine the progress being made in the investigation of Dalia's involvement in possible stolen property, and related offenses. He also read the logs to insure that the monitoring agents were following my instructions on minimization. [He] observed numerous entries in the logs that the agents had determined that a communication was non-pertinent, and had discontinued monitoring this conversation. During each day's examination of the logs, [he] would note communications that appeared highly pertinent to the investigation. It was [his] practice to personally listen to many conversations and if [he] determined that a particular conversation was important, [he] directed that a verbatim transcription of that conversation be made that day.
>
> In addition to the handwritten logs prepared by the monitoring agents while they listened to communications, a set of summary verbatim transcripts was pre-

pared by the F.B.I. during the surveillance. Usually there was a one or two day time lag between the time a communication was intercepted and the time that a summary verbatim transcript was available. [He] studied each days' [sic] summary verbatim transcript as it became available to determine what progress was being made in the electronic surveillance, and to insure that [his] instructions on monitoring and minimization were being followed.

*Id.* at ¶ 3(a) and (b).

The defendant alleges that a close review of the logs and summary transcripts shows substantial discrepancies between information found there and information imparted to the court by way of progress reports. The only material submitted in support of this contention, however, by way of affidavit, was on July 1, 1976 before the hearing or court-ordered review of logs and summary transcripts wherein Mr. Ruprecht and Mr. Giegerich voiced their conclusions and computations.

They, in effect, assert that the government figures are incorrect with respect to the number of pertinent or incriminatory conversations and the number of conversations discontinued because of irrelevancy. For example, defendant asserts that

the Court overseeing this wiretap was informed by the Government through progress reports that during the first ten days of surveillance a total 587 conversations were intercepted of which the Government discontinued 460 because they were irrelevant and that 127 of those conversations dealt with stolen goods or hijacking. In fact, the logs and transcripts show that there were approximately 579 conversations intercepted. Of these, the agents discontinued surveillance of only 136 conversations and listened to 443 in their entirety. Of the 443 conversations intercepted, only a tiny fraction could be deemed to be remotely incriminatory.

Ruprecht Affidavit at ¶ 18.

On July 29, 1976 at the evidentiary hearing the court ordered the parties to meet and review the logs, transcripts and tape recordings compiled during the electronic surveillance after which the government was to file its written analysis of the conversations reviewed; the defense was then to submit its own written analysis. Transcript of Hearing at 19–20. Affidavits of James Deichert and Agent Long were then submitted.

Two standards have been developed by appellate courts which have considered the issue of misrepresentation. In *United States v. Carmichael*, 489 F.2d 983, 988–89 (7th Cir. 1973), the court held that a defendant is entitled to a hearing to challenge a facially sufficient affidavit when an initial showing is made either: (1) that the government agent intentionally misrepresented a fact, whether or not material; or (2) that the government agent was reckless and misrepresented a material fact. This standard was adopted by the Eighth and Sixth Circuits in *United States v. Marihart*, 492 F.2d 897, 900, *cert. denied*, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974) and *United States v. Luna*, 525 F.2d 4, 8 (1975), *cert. denied*, 424 U.S. 965, 96 S.Ct. 1459, 47 L.Ed.2d 732 (1976), respectively.

The Fifth Circuit, in *United States v. Thomas*, 489 F.2d 664 (1973), *cert. denied*, 423 U.S. 844, 96 S.Ct. 79, 46 L.Ed.2d 64 (1975), adopted a slightly different test. It held, as did the Seventh Circuit in *Carmichael, supra*, that an affidavit is invalid if the government agent intentionally misrepresented a fact, whether or not material. With respect to the second test, however, an affidavit is invalid if the error was non-intentional but material to the establishment of probable cause. *Id.* at 669. No finding of recklessness is required. *See also United States v. Hunt*, 496 F.2d 888, 893 (5th Cir. 1974). The Third Circuit, while considering both tests in *United States v. Armocida, supra*, found it unnecessary to decide between them.

In the case at bar no affidavit has been submitted or testimony presented by the defendant which alleges or supports the allegation that the government intentionally misrepresented facts in its "probable

cause" affidavits. Defendant in his Supplemental Memorandum states:

It is evident that these figures are *intentional* misstatements designed to create in the mind of the supervising court a belief that the wiretap, in its early days, was highly productive and justified continuation.

Defendant's Supplemental Memorandum, at 4 (emphasis added). This alone, however, is insufficient to show an intentional misrepresentation. I am satisfied that no basis exists to invalidate the "probable cause" affidavits on the grounds of intentional misrepresentation on the record before me.

The question before the court, then, is whether the facts allegedly misrepresented in the progress reports are material to a showing of probable cause. I find that they are not.

Defendant, through the affidavits of Giegerich and Ruprecht and memoranda, assert errors in the computations of pertinent calls intercepted and discontinued calls.

With respect to the number of pertinent calls, the government, pursuant to a request from the court, submitted an affidavit with a chart which compared the number of pertinent conversations listed in the progress reports with the number of such conversations identified by the government at its conferences with the defense attorney which the court had ordered. *See* Deichert Affidavit of December 23, 1976. The affidavit indicates that there is little discrepancy between the two sets of computations. Defendant submits, in his memorandum, that of the 235 conversations considered pertinent by the government, which were reviewed by defense counsel and the government, "some 35 conversations *may be construed* as relating to stolen goods or hijacking operations and that the remaining 200 calls should not have been reported to the Court as incriminatory." Defendant's Supplemental Memorandum at 5–6.

The central issue, however, is whether the agents at the time of the wiretapping believed these calls to be pertinent. I find that without the benefit of hindsight, they could conceivably have found meaning in many of the conversations labelled pertinent. As was stated by the government at the hearing, the subjective evaluation by the agent is at issue. Defense counsel, at the hearing, specifically questioned one conversation, on March 14, 1973, labelled pertinent. The government could find no substantiation for the assertion in the progress report that it concerned hijacking information. That alone, however, is not sufficient to support the allegation of the material misrepresentation. Since the time of the hearing and since the tapes were reviewed by counsel on both sides, the government has submitted what it considers a corrected analysis of the calls. This shows, as mentioned above, little discrepancy. The question is not what the evaluation of defense counsel is after the wiretapping occurred and the indictment was returned, but what appeared to be a relevant conversation to the agent investigating possible criminal activity.

In a letter response to the government's affidavits defendant includes a chart showing a comparison of the government's misrepresentation as to the number of calls the progress reports state were minimized and the number of calls actually minimized as indicated by Agent Long's Affidavit. Defendant asserts that

the government informed the Court during these ten days of electronic surveillance that it had minimized 606 irrelevant conversations when, in fact, it now admits only 198 calls were minimized. Thus the government exaggerated its minimization efforts by over 300%.

Defense Letter Response at 2–3.

After an examination of the logs, transcripts and affidavits submitted, I find that any errors contained in the progress reports, with respect to the number of pertinent and minimized calls, do not rise to the level of material misstatements.

While the errors concerning the number of minimized calls was far greater than it need have been with a greater degree of care, these errors were not sufficient to be

considered material. *See* minimization discussion, *infra.*

■ I further find that the applications to continue the electronic surveillance contained sufficient information on which this court could find probable cause that the offense was a continuing criminal enterprise and that the surveillance should be continued because the objectives listed in the court orders—revealing the identities of defendant's confederates, their places of operation and the nature of the conspiracy involved—had not yet been achieved. *See United States v. Vento,* 533 F.2d 838, 853–54 (3d Cir. 1976). I do not believe that good faith error in conscientiously prepared daily progress reports should be held to require suppression of evidence. *See United States v. Marihart, supra,* 492 F.2d at 901, *United States v. Thomas, supra,* 489 F.2d at 669; *United States v. Manfredi,* 488 F.2d 588, 600 (2d Cir. 1973).

Defendant's last contention in support of his motion to suppress is that the government agents failed to reasonably minimize the extent of their interceptions.[2] Defendant's Brief at 14. He further states:

It would appear questionable that during the course of two months a suspected conspirator would not have at least a few innocent telephone conversations, yet in spite of that reasonable presumption there appear but a handful of Dalia's telephonic communications which were voluntarily terminated as non-pertinent.

*Id.*

According to 18 U.S.C. § 2518(5),

Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the autho-

rized objective, or in any event in thirty days.

The statutory requirement of minimization must be determined on a case-by-case basis. *United States v. Vento, supra,* 533 F.2d at 852; *United States v. Cox,* 462 F.2d 1293 (8th Cir. 1972), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2623, 41 L.Ed.2d 223 (1974). The standard is one of the *reasonableness* of a particular interception. *United States v. Armocida, supra,* 515 F.2d at 42. The minimization requirement is met if "on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could do to avoid unnecessary intrusion." *United States v. Tortorello,* 480 F.2d 764, 784 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Other relevant factors are the degree of supervision exercised by the attorney from the Department of Justice and the role played by the court in supervising the electronic surveillance. *See United States v. Armocida, supra,* 515 F.2d at 44–45; *United States v. Quintana,* 508 F.2d 867, 874–75 (7th Cir. 1975).

Defendant contends that "virtually" every conversation engaged in by him between March 15 and May 16, 1973 was intercepted in its entirety by the monitoring agents and that, by failing to terminate interception of any conversations, the agents violated the minimization requirement.

The government disputes the allegation that no attempt was made to limit the interception of defendant's conversations. In the Affidavit of Agent Long of December 22, 1976, he lists a breakdown of calls minimized during the period of March 14 through March 24, 1973, as an example of the government's efforts at minimization. With respect to one telephone, for example, on March 14, one call was discontinued; on March 15, 14 calls were discontinued; on March 16, 17 calls were discontinued; on

---

2. Defendant, in his last submission, Letter Response of December 30, 1976, states that it is not his contention "that the government inappropriately minimized their surveillance." Rather, he asserts, it misled the court as to minimization. Because the "failure to minimize" argument was raised by defendant in his earlier submission, however, I will consider that argument. *See* Defendant's Brief at 13–15.

March 17, 1 call was discontinued; on March 19, 8 calls were discontinued; on March 20, 21 calls were discontinued.

It should be noted that even if defendant's allegation is true, the mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute. *See United States v. Bynum*, 485 F.2d 490, 500 (2d Cir. 1973), *cert. denied*, 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277 (1975); *United States v. Cox, supra*, 462 F.2d 1293, 1301; *United States v. Leta*, 332 F.Supp. 1357, 1360 n.4 (M.D.Pa.1971), *rev'd on other grounds*, 467 F.2d 647 (3d Cir. 1972).

The facts contained in the affidavits submitted by the government in connection with this motion detail the guidelines and procedures established by the supervising attorney and the agent in charge of the electronic surveillance, as well as the efforts made by the monitoring agents to minimize interceptions. The statistics contained in the affidavits and the handwritten logs make a strong showing that an effort at minimization was certainly made. While there is some difference between the figures presented prior to the review ordered by the court of the tapes and summaries and those in the latest affidavit of Agent Long, the differences are not substantial, so that the minimization figures in the reports appear to be relatively accurate.

On the basis of the above-mentioned factors, I find that the government has made a prima facie showing of reasonable effort in minimizing the interceptions of non-pertinent conversations. As the court stated in *United States v. Armocida, supra*, once the government has made this showing

the burden thus shifts to the defendant to show more effective alternative procedures for minimization which nevertheless would permit the government to achieve its objectives.

515 F.2d at 45.

The affidavits submitted by the government illustrate that numerous crimes involving stolen property were being discussed over defendant's telephones and at his office. Defendant was allegedly at the heart of a widespread and complex stolen property "fencing operation." Defendant, in effect, was an alleged broker or transfer agent for stolen property obtained from the sellers and the purchasers. Because of the nature of defendant's business—salvage and bankruptcy sales of property—it was, according to the government, and I accept this as true, often difficult to establish if a particular conversation related to an innocent business transaction or to the sale of stolen goods.

In *United States v. Tortorello*, 342 F.Supp. 1029, 1038 (S.D.N.Y.1972), *aff'd*, 480 F.2d 764 (2d Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973), the court discussed the problems which arise in making an ad hoc determination of pertinency:

Obviously, some non-pertinent items crept in because they were recorded before a determination of their relevancy could be made. Other such items were included because they appeared in conversations also containing pertinent items.

This court has also noted that:

It is often impossible to determine if a particular telephone conversation would be irrelevant and harmless until it has been terminated. Frequently two individuals using the telephone will discuss social matters or items of general interest before getting to the precise point which is to be covered in the call.

*United States v. Falcone, supra*, 364 F.Supp. 877, 886 (D.N.J.1973), *aff'd*, 505 F.2d 478 (3d Cir.), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975).

In all three court orders, the targets of the surveillance were communications involving "the theft and robbery of goods, moving in interstate commerce, and the transportation, sale, storage, or distribution of these stolen goods, and the participants in the commission of these offenses." Each individual order stated that the

interceptions shall not automatically terminate when the type of communication

described above . . . have first been obtained, but shall continue until communications are intercepted which reveal the manner in which Larry Dalia, and others as yet unknown, participate in theft from interstate shipments; sale or receipts of stolen goods; and interference with commerce by threats or violence; and which reveal the identities of his confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of twenty (20) days from the date of this Order, whichever is earlier.

Because of the broad nature of the alleged conspiracy and the number of individuals, more interceptions necessarily occurred than in a less complex crime. The court in *United States v. Armocida, supra,* similarly recognized the problem that

> where the criminal enterprise under investigation is a large-scale conspiracy, it may be necessary for the government to intercept more conversations than where the investigation is of a more limited criminal undertaking. This is especially so where, as here, the judicially approved wiretap is designed to identify other participants in the conspiracy and to determine the scope of the conspiracy.

515 F.2d at 44.

Defendant asserts that "a number of obviously non-pertinent business and personal conversations were overheard and recorded by the government agents, beyond their authority," and that, as compared to the conspiracy sought to be flushed out in *Falcone,*

> [h]ere, there is no air of sophistication, no foreign intrigue, no criminal network of far reaching impact, yet Lawrence Dalia warrants interception of his every word for some *60 days.* No matter the end result of this matter, it clearly does not warrant the means.

Defendant's Brief at 15.

While no "foreign intrigue" or "air of sophistication" may have existed in this case, this does not mean that the case was not complex or that the investigating by the government was any less difficult than in any other case where wiretapping was found necessary.

I find that the government has made a prima facie showing of a reasonable effort in minimizing the interception of innocent conversations and that the defendant has failed to sustain his burden of showing that more effective alternative procedures for minimization might have been used by the government to achieve its objectives.

. Defendant's motion to suppress the tapes secured through the government's wiretapping device of his telephones is, therefore, denied.