564 F.2d 633
 UNITED STATES of America, Appellee,
v.
Eugene SCAFIDI, Bario Mascitti, Anthony DiMatteo, Saverio
Carrara, Michael DeLuca, James Napoli, Jr., James
V. Napoli, Sr., Robert Voulo and Sabato
Vigorito, Appellants.
 Nos. 909 to 917, Docket 76-1495.
 United States Court of Appeals, Second Circuit.
 Argued May 16, 1977.
Decided Oct. 12, 1977.
 
 Michael E. Moore, Atty., Dept. of Justice, Washington, D.C. (Fred F. Barlow, Sp. Atty., Dept. of Justice, Brooklyn, N.Y., and David G. Trager, U.S. Atty. for the Eastern District of New York, Brooklyn, N.Y., William G. Otis, Atty., Dept. of Justice, Washington, D.C., of counsel), for appellee.
 Arnold E. Wallach, New York City, for appellant Scafidi.
 David J. Gottlieb, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City, William J. Gallagher, New York City, of counsel), for appellant Mascitti.
 Richard W. Hannah, Brooklyn, N.Y., for appellant DiMatteo.
 Salvatore Piazza, Brooklyn, N.Y., for appellant Carrara.
 Max Wild, New York City, for appellants DeLuca and Napoli, Sr.
 Thomas J. O'Brien, New York City, for appellant Napoli, Jr.
 Dominick L. DiCarlo, Brooklyn, N.Y. (Donald E. Nawi, New York City, of counsel), for appellant Voulo.
 Gustave H. Newman, New York City, for appellant Vigorito.
 Albert J. Brackley, Brooklyn, N.Y., on the brief, for appellant DeLuca.
 Rubin, Baum, Levin, Constant & Friedman, New York City, of counsel, for appellant Napoli, Sr.
 Before MOORE, SMITH and GURFEIN, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 Nine defendants, Eugene Scafidi, Robert Voulo, James Napoli, Sr., James Napoli, Jr., Michael DeLuca, Sabato Vigorito, Saverio Carrara, Bario Mascitti, and Anthony DiMatteo appeal their convictions, after a jury trial before Chief Judge Mishler in the Eastern District of New York, for operating illegal gambling businesses in violation of 18 U.S.C. Sec. 1955.
 
 
 2
 The counts upon which the various defendants were convicted related to operations at different times and places. More specifically, twenty defendants were tried together on four counts of a seven-count indictment. Scafidi and Voulo were convicted on Count Two (the "967 East Second Street Count") of conducting an illegal gambling business from March, 1972 to July 1972. Appellants Napoli, Sr., Napoli, Jr., DeLuca, Vigorito, Carrara, Mascitti, and DiMatteo were convicted on Count Four (the "Hiway Lounge Count") of conducting an illegal gambling business from April, 1973 to June, 1973. Count Three (the "Apartment 309 Count") was dismissed after trial because the jury did not find five people involved in that gambling business, as required by Sec. 1955. Count Seven, the conspiracy count, was dismissed at the close of the Government's case because the indictment alleged a single conspiracy but the evidence showed at least two. Sentences for the defendants ranged from five years in prison and a $20,000 fine (Napoli, Sr.) to two months in prison and 34 months probation (Scafidi).
 
 I.
 
 3
 The evidence at trial showed a large-scale numbers lottery operating in Brooklyn during three discrete time periods: Spring, 1972 (the 967 East Second Street Count); Winter, 1972-73 (the Apartment 309 Count); and Spring, 1973 (the Hiway Lounge Count).The 967 East Second Street Count: Scafidi and Voulo.
 
 
 4
 On May 1, 1972, FBI agents conducted a warrant-authorized search of a residence at the above address. They discovered Voulo and two others in the basement operating a policy "bank". They seized a great deal of betting paraphernalia, some of which contained Voulo's fingerprints.
 
 
 5
 Visual surveillance prior to the search had established that Voulo, Scafidi and others had been using the residence for more than one month. Apparently, Scafidi regularly picked up daily policy "ribbons" for delivery to the ring's "controllers" around the city.
 
 
 6
 Also, a warrant-authorized search of 405 Elder Lane in Brooklyn in June, 1971, had found Scafidi and Voulo standing at a table piled high with betting slips, adding machines and cash.
 
 
 7
 The Apartment 309 Count: DiMatteo, Mascitti, Scafidi, Voulo, and Rocco Riccardi (all charged, but count dismissed after guilty verdicts were rendered only against the first four).
 
 
 8
 The evidence on this count consisted primarily of tape recordings made pursuant to court-ordered electronic equipment (referred to herein as "bugs") placed at the apartment of a friend of Mascitti. The friend allowed Mascitti to use the apartment for a few hours each afternoon while she was absent. DiMatteo and Mascitti were shown to be "bank" workers who called Scafidi about gambling at least once each day. A court-ordered wiretap of Scafidi's home phone showed that he operated a lottery "accounting office". Because one defendant, Riccardi, was acquitted on this count, the Government failed to show the involvement of five people in the operation, as necessary under Sec. 1955. The count was thus dismissed.
 
 
 9
 Three court orders had authorized the bugs at Apartment 309: Orders 309-I, 309-II, and 309-III. 309-I was issued by Judge Orrin G. Judd on December 8, 1972, and authorized interceptions for 15 days. 309-II was issued by Judge Jack B. Weinstein on January 15, 1973, permitting interceptions for 15 days. 309-III was issued by Judge George Rosling on February 20, 1973, approving interceptions for 15 days at Apartment 309 and at Scafidi's residence in Queens. All the orders listed some of the defendants by name and included "others as yet unknown" as targets. The bugs at Apartment 309 were installed on the night of December 8, 1972, after the building superintendent gave the agents a key to gain entry. The agents re-entered the apartment once more during the surveillance to reposition one bug.
 
 
 10
 Because the Apartment 309 Count was ultimately dismissed, any investigatory errors of the police are relevant on appeal only to the extent that the evidence presented for this Count might have "spilled over" to affect other counts.
 
 
 11
 The Hiway Lounge Count: The Napolis, DeLuca, Vigorito, Carrara, Mascitti, and DiMatteo.
 
 
 12
 This was the principal count. Court-ordered bugs revealed that the Lounge was the headquarters for a massive numbers game. James Napoli, Sr. was the leader, with Napoli, Jr., Carrara, and Vigorito working as "controllers". DeLuca worked as an "accountant", and Mascitti and DiMatteo were "bankers".
 
 
 13
 The bugs at the Lounge had been installed pursuant to three court orders: Orders Hiway-I, Hiway-II and Hiway-III. Hiway-I was issued by Judge John R. Bartels on April 12, 1973, authorizing interceptions for 15 days excluding Sundays. The named targets were the Napolis, DiMatteo, DeLuca, Martin Cassella and Richard Bascetta. Hiway-II was issued by Judge Bartels on May 3, 1973, i.e., three days after the end of Hiway-I, authorizing bugs for 15 more days, excluding Sundays. The targets named were the Mapolis, DeLuca, Voulo, several non-appellants, and "others as yet unknown". Hiway-III was issued on May 24, 1973, i.e., three days after the end of Hiway-II. The tapes obtained by HiwayIII were not sealed until more than three months later. No evidence from Hiway-III was introduced at trial.
 
 
 14
 The listening devices used in the Lounge were placed by FBI agents on the night of April 12-13, 1973. They were originally placed with one at the bar and one in a back room. During the pendency of Hiway-I the agents re-entered the Lounge to move the bar bug into the back room. During the three-day "pause" between Hiway-I and Hiway-II, Judge Judd issued an order authorizing the agents to enter the Lounge on the night of May 2-3 to restore the batteries in the bugs. At some point during Hiway-II and Hiway-III the agents reentered to restore the batteries once again.
 
 II.
 
 15
 The appellants raise many points of alleged error and each adopts the points argued by the others.
 
 
 16
 Besides the question of standing, namely, the right to question the legality of the surreptitious entries by agents to place the electronic devices which recorded the appellants' conversations, appellants' arguments focus primarily on various claims that the warrants pursuant to which the agents acted were for numerous reasons illegal and violative of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Sec. 2510 et seq.
 
 
 17
 At the close of the Government's case, the conspiracy count was dismissed as to all appellants because of the discrepancy between the single conspiracy alleged in the indictment and the evidence of multiple conspiracies shown at trial. The Court's dismissal of the conspiracy count gives rise to appellants' claim that reversible error resulted from the Court's refusal to grant a mistrial or to sever the trial as to the individual defendants. Their claim is that the spill-over effect of the evidence admitted pursuant to the conspiracy count was highly prejudicial and probably responsible for the respective convictions.
 
 
 18
 Whether appellants have standing to object to the surreptitious entries of Apartment 309 and the Hiway Lounge.
 
 
 19
 Appellants argue that the evidence derived from the bugs planted in Apartment 309 and the Hiway Lounge should be suppressed because of allegedly improper surreptitious entries made by the agents to place and recharge the bugging devices. The Government contends that none of the appellants has standing to question the entries into Apartment 309, and that only Napoli, Sr. has standing to object to the entries into the Lounge.
 
 
 20
 All of the appellants were in some way overheard on the bugs planted in Apartment 309 and/or the Lounge. Thus, they all claim that they have standing to object to any unauthorized entries because they are "aggrieved persons" within the meaning of 18 U.S.C. Sec. 2510(11). But that statute simply confers standing to object to unauthorized electronic surveillance; it does not expressly encompass standing to object to allegedly unauthorized entries to place or recharge the bugs. Only one present at the seizure or with a recognized "interest", either possessory or proprietary, in the premises, can claim the required "expectation of privacy" needed to object to such illegal entries. See Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (proprietor can object to any unauthorized wiretap; those overheard can object only to their voice being overheard); and Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (those with no interest in storehouse cannot object to illegal search which uncovered stolen merchandise).
 
 
 21
 The elder Napoli was the manager of the Hiway Lounge, and as such can raise any issue of unauthorized entry. But none of the other appellants had any interest in the Lounge except for their presence there for a few hours each afternoon. Mascitti has an arguable claim to a proprietary interest in Apartment 309 because the true lessee, his friend, lent him the apartment's key so that he could enter on his own. But the district court found that his possession of the key and use of the premises for such a limited purpose was not enough to give him standing.
 
 
 22
 Whatever the exact, technical interests, or lack thereof, which these appellants had in the premises entered by the agents, it seems artificial to say that a person overheard, whose conversation would not have been overheard but for the entry, has no standing to move to suppress the conversations on a claim that the entry was improper. In any event, whether standing is accorded in this appeal to only one or any number of the appellants will not affect our holding that the Orders and the agents' activities were entirely proper. Therefore, for purposes of this appeal, we need not decide whether or not standing exists for the defendants to raise the claim of allegedly illegal entry.
 
 
 23
 Whether a court order authorizing illegal entry for secret placement, repair and/or removal of bugs is required as a part of, or in addition to, the court order authorizing the use of bugs.
 
 
 24
 Mascitti and his co-appellants claim that Title III of the Omnibus Crime Control Bill of 1968, 18 U.S.C. Sec. 2510 et seq., prohibits all surreptitious police entries to install, repair or remove court-authorized bugs. However, it is clear from the legislative history of the Bill as well as the language of the statute, that Congress intended to empower courts to permit such entries in proper cases and under proper procedures. See United States v. Ford, 414 F.Supp. 879, 883 (D.D.C.1976), aff'd, 553 F.2d 146 (D.C.Cir.1977); S.Rep. No. 1097, 90th Cong., 2d Sess. 67, 103 (1968).
 
 
 25
 There remains the question of whether the authority granted by Title III is properly implemented where the court which approves the use of bugs does not explicitly authorize, either in the authorization order or in a separate order, secret break-ins to place, repair and/or remove the bugs. The Government argues that permission to make secret entries is at least implied in the bug authorizations here. Appellants argue, however, that all evidence gathered must be suppressed unless the court specifically authorizes secret entries.
 
 
 26
 The courts appear to be split on this issue, particularly after the recent District of Columbia Court of Appeals decision wherein it was held that the legislative purpose of Title III requires a separate court order for entry, United States v. Ford, 553 F.2d 146 (D.C.Cir.1977). See United States v. Altese, No. 75 Cr. 341 (E.D.N.Y., Oct. 14, 1976) (separate order not required); United States v. Dalia, 426 F.Supp. 862, 865-66 (D.N.J.1977) (separate order not required); United States v. Finazzo, 429 F.Supp. 803, 806-8 (E.D.Mich.1977) (separate order required). It must be noted that until the District of Columbia Circuit spoke on this issue, it was generally considered proper practice not to require a separate warrant for entry.
 
 
 27
 The orders in our case, after a recital of facts charging that various appellants "have committed and are committing offenses involving the conducting, financing, managing, supervising, directing or owning in whole or in part a gambling business" in violation of State and Federal law, authorized the agents to intercept oral communications of the appellants specified therein at the named premises. The orders further provided that
 
 
 28
 "this authorization to intercept oral communications shall be executed as soon as practicable after signing of this Order and shall be conducted in such a way as to minimize the interception of conversations not otherwise subject to interception...." App. at A238, A276.
 
 
 29
 There can be no doubt that the warrants were based upon adequate factual affidavits. The alleged defect in the warrant is not the underlying factual basis therefor, but its lack of specific "breaking-in" authorization and a statement of the manner in which such "breaking-in" was to be conducted.
 
 
 30
 But the most reasonable interpretation of the orders in this case, granting authorization to bug private premises, is that they implied approval for secret entry. Indeed, any order approving electronic surveillance of conversations to be overheard at a particular private place, must, to be effective, carry its own authority to make such reasonable entry as may be necessary to effect the "seizure" of the conversations.
 
 
 31
 As Chief Judge Mishler stated below in his Memorandum Decision dated October 14, 1976,
 
 
 32
 "[I]t is this Court's position that once probable cause is shown to support the issuance of a court order authorizing electronic surveillance thereby sanctioning the serious intrusion caused by interception, there is implicit in the court's order, concomitant authorization for agents to covertly enter the premises and install the necessary equipment." App. at A133.
 
 
 33
 Once a judicial officer is convinced by the facts presented to him that electronic surveillance will aid in the detection of crime, his authorization that it be used should then transfer to the appropriate police agency the decision as to the precise mechanical means whereby the order is to be carried out. If the instrumentality to be used is a "bug", the placing of such a bug must of necessity be in the hands of the persons so authorized. And such placing will have to be surreptitious, for no self-respecting police officer would openly seek permission from the person to be surveilled to install a "bug" to intercept his conversations.
 
 
 34
 It would be highly naive to impute to a district judge a belief that the device required to effect his bugging authorization did not require installation. But neither should judges be presumed to have such familiarity with the installation of such devices or the premises in which they are to be installed that a court should be required in its order to specify the method of entry, the appropriate location of the bug, and the steps to insure its proper functioning. Were this to be required, a judge, in consultation with law enforcement officers, might have to visit the premises to be entered and discuss the best (or least objectionable) method of entry and the areas for the installations. His order would then have to contain explicit directions as to how to proceed, with the risk that any deviation therefrom, created by unforeseen emergencies, would create a possibility of illegality. It would be most unseemly for the courts to invade the province of law enforcement agencies by assuming that their competence was greater than that of the agencies presumably skilled in their field. It is significant that the statute, generally so detailed in its supervisory requirements, makes no mention of any need for a separate entry order. That the statute requires general supervision by the courts over the bugging operation does not even impliedly impose on them the practical enforcement steps.
 
 
 35
 We, therefore, hold that when an order has been made upon adequate proof as to probable cause for the installation of a device in particular premises, a separate order authorizing entry for installation purposes is not required.
 
 
 36
 No do the subsequent entries for repair or battery recharging alter this result. These were not entries for any purpose other than that originally authorized. No greater incursion into the appellants' privacy occurred from the re-entries than resulted from the original entries. Furthermore, there is no suggestion that in any of the entries the FBI agents seized or attempted to seize or inspect papers or other articles not embraced in the order. They adhered to the authorized single purpose of seizing conversations represented in the papers on which the orders were granted as being of a criminal nature.
 
 
 37
 Whether the Government violated various provisions of Title III.
 
 
 38
 Mascitti contends that the affidavits underlying Order 309-I did not sufficiently demonstrate the need to bug the particular apartment. This claim is groundless. Physical surveillance of Apartment 309 had detailed the regular goings and comings of DiMatteo and Mascitti, and analysis of the apartment's trash had revealed betting slips and records.
 
 
 39
 Napoli, Sr. presents a similar insufficiency contention regarding the affidavit for interceptions at the Hiway Lounge. But the affidavit presented information gleaned from the bug of Apartment 309 as well as information gotten from confidential informants with established records of credibility. Also, physical surveillance identified the comings and goings of the principal suspects. The 25-page affidavit of Special Agent Parsons reveals more than sufficient information to justify the issuance of the Hiway-I warrant. App. at A277-A302.
 
 
 40
 DeMatteo argues that the affidavit underlying the bugs at Apartment 309 did not sufficiently demonstrate what other investigative procedures had been tried without success. See 18 U.S.C. Sec. 2518(1)(c). But the affidavit adequately informs the judge of the "nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods", which is precisely what it has to do to satisfy the statute. United States v. Hinton, 543 F.2d 1002, 1011 (2d Cir.1976), cert. denied, 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 783 (1977); United States v. Fury, 554 F.2d 522, 530 (2d Cir.1977).
 
 
 41
 Mascitti, DiMatteo and Vigorito argue that the "delays" in sealing the tapes of conversations after the expiration of their authorizing orders require suppression of the tapes.
 
 
 42
 In United States v. Fury, supra, 554 F.2d at 532-33, we held that, where a single order was extended, the tapes did not have to be sealed until the end of the last extension. Where the intercept is of the same premises and involves substantially the same persons, an extension under these circumstances requires sealing only at the conclusion of the whole surveillance. United States v. Principie, 531 F.2d 1132, 1142 n. 14 (2d Cir.1976), cert. denied, 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977). The foregoing applies to the short delays in sealing 309-I and 309-II as well as Hiway-I and Hiway-II, for once the later Orders are deemed extensions of the prior ones, the administrative delay in sealing--in only one instance more than seven days--is reasonable and fully understandable. Even if the later Orders are deemed separate events, the sealing delays are quite distinguishable from those in the case relied upon by the appellants, United States v. Gigante, 538 F.2d 502 (2d Cir.1976), where the unexcused delay was for over eight months.
 
 
 43
 The only tapes that were not sealed during the pendency of a subsequent extension order were those made pursuant to Order 309-III. These tapes were sealed after a delay of seven days caused primarily by the preoccupation of Special Attorney Barlow with preparations for the upcoming trial. Testimony presented to the trial judge made clear that the delay was not the result of any intent to evade statutory sealing requirements or to gain any tactical advantage. We agree with the trial judge that the Government has presented a satisfactory explanation for this short delay, fully in accord with the requirements of 18 U.S.C. Sec. 2518(8)(a). United States v. Fury, supra, 554 F.2d at 533.
 
 
 44
 Vigorito argues that the Government continued the Hiway-I and -II bugs beyond their 15-day expiration dates. But the authorizations for the bugs expressly excluded counting Sundays, so that all of the overheard conversations were within the authorized time periods.
 
 
 45
 Mascitti contends that the Government's failure to timely file "progress reports" to the authorizing judges requires suppression of the tapes gotten from the bugs. In several instances involving the 309 Orders, progress reports were filed up to two weeks late or not at all; with the Hiway Orders, one report was filed two days late. While these reports should have been timely filed, the sanction for failure to do so is surely not automatic suppression of the tapes. The requirement of reports, designed to enable the district judge to evaluate the continuing need for surveillance, is in the first instance discretionary with the judge authorizing the bugs. See United States v. Iannelli, 477 F.2d 999, 1002 (3rd Cir.1973), aff'd 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). So, surely, are any sanctions for failure to file timely. See 18 U.S.C. Sec. 2518(6). The judges here clearly did not abuse their discretion.
 
 
 46
 Carrara argues that the Government's failure to name him in the Hiway-II order requires suppression of his conversations gathered by that order. This argument is entirely refuted by United States v. Donovan, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Napoli, Sr.'s similar claim is also refuted by Donovan.
 
 
 47
 DiMatteo argues that the misidentification of him as "Pasquale Rossetti" in Order 309-I requires suppression. This argument is frivolous in light of the complete absence of evidence that the Government was not acting in good faith. And the argument of DiMatteo based on failure to serve a timely inventory notice is foreclosed by United States v. Donovan, supra. See also United States v. Variano, 550 F.2d 1330, 1335-36 (2d Cir.1977).
 
 
 48
 Whether there was sufficient evidence to convict Scafidi and Cararra.
 
 
 49
 Only Scafidi and Carrara question the sufficiency of the evidence against them.
 
 
 50
 Scafidi was observed regularly using 967 East Second Street. In fact, he arrived at the apartment once while the police were searching it. Prior to and subsequent to the use of the apartment, Scafidi had been involved with policy rings which used the same type of wagering records and the same runner identifications. Also, Scafidi's phone calls from his home, properly intercepted by wiretaps, convincingly proved his involvement with the venture.
 
 
 51
 Carrara was taped while in several incriminating conversations with Napoli, Sr. which strongly support the inference that Carrara was actively involved in the ring as one of its "controllers". The jury properly convicted him on this basis.
 
 
 52
 Whether Count Four of the indictment (the Hiway Lounge Count) was legally sufficient.
 
 
 53
 Napoli, Sr. contends that the Hiway Lounge count of the indictment was fatally defective for not specifying the type of gambling business he was alleged to have conducted. This argument holds no merit. The indictment tracked Sec. 1955 while specifying approximate dates and relevant New York statutes. This is sufficient under United States v. Salazar, 485 F.2d 1272, 1277 (2d Cir.1973), cert. denied, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974).
 
 
 54
 Whether appellants were prejudiced by "spill over" from their joint trial.
 
 
 55
 Most of the appellants (Napoli, Jr., Mascitti, Vigorito, Voulo, DeLuca, and Carrara) argue that once the trial court dismissed the conspiracy count at the end of the Government's case, the remaining substantive counts should have been severed for separate trials. The settled rule is that such a severance is not required unless prejudice would otherwise result or unless the conspiracy count had not been alleged in good faith. United States v. Ong, 541 F.2d 331, 337 (2d Cir.1976), cert. denied, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977). There is no evidence here of bad faith on the part of the Government, and the conspiracy count was not frivolous; it was dismissed only for variance. The trial court gave the jury a lengthy cautionary instruction to disregard the conspiracy evidence and to judge each defendant on his own words and deeds. The jury showed its understanding of the instruction by acquitting several defendants. Moreover, the defendants convicted were found guilty on strong evidence, greatly reducing any risk of prejudice from joinder.
 
 
 56
 We have carefully considered all of the numerous issues raised by the appellants and find them to be without merit. The convictions are affirmed.
 
 GURFEIN, Circuit Judge, concurring:
 
 57
 The dissenting opinion of my respected brother, J. Joseph Smith, and the split in the circuits, see United States v. Ford, 553 F.2d 146 (D.C.Cir.1977), and compare United States v. Agrusa, 541 F.2d 690 (8th Cir.1976), impels me to add some of my own reasons for concurring in the majority opinion. Congress has constructed a statutory scheme for meeting the problems raised in Berger v. New York, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), and Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), by enacting Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Sec. 2510 et seq. The issue is narrow. When a federal agent obtains access by trespass to premises in which he has been ordered to install a device to intercept oral communications by a court order which faithfully follows Title III and which includes a finding of probable cause, has he nevertheless intercepted conversations in a lawless manner as if he had no court order at all? Was there in fact "a neutral predetermination of the scope of [the] search"? Katz v. United States, 389 U.S. at 358, 88 S.Ct. at 515. Or are entries to plant "bugs" themselves unconstitutional invasions of privacy distinct from the actual eavesdrop sanctioned in the order? An affirmative answer was "[e]ssential to [the] holding" in United States v. Ford, supra, 553 F.2d at 170, on constitutional grounds. I respectfully disagree.
 
 
 58
 Title III covers oral interceptions ("bugging") without prescribing any duties for the judicial branch on the method to be used in installing the "bug". These statutory requirements were carefully tailored to meet the constitutional requirements set out in Berger and Katz. See United States v. Tortorello, 480 F.2d 764, 771-75 (2d Cir.), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). Congress knew that whether a "bug" was put in place by trespass or otherwise, the use of a "bug" to intercept conversations would require a warrant except when the "bug" is carried by a participant in a face-to-face conversation, On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1070 (1952), or is used with the consent of a party. See Katz, supra. The warrant under Title III is limited to interception of oral conversations, 18 U.S.C. Sec. 2518, and does not in any way permit the search and seizure of goods or papers on the premises. Indeed, if such goods or papers were subjected to search under the interception order, suppression would follow. There is an analogy to the opening of foreign mail by the Customs, which is not constitutionally offensive provided the letters themselves are not read. See United States v. Ramsey, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).
 
 
 59
 What the statute requires is not a specification by the judge of the method for placing the "bug" but simply "a particular description of the place where the communication is to be intercepted". Congress knew that an order such as is under review, that "electronic surveillance of the oral communications of the above-named subjects shall occur at the above described premises" (emphasis added), would require covert installation. If supporting proof were needed, it is supplied by the 1970 Amendment, Pub.L. No. 91-358, Title II, Sec. 211(b), 84 Stat. 654 (amending 18 U.S.C. Sec. 2518(4)), under which the order authorizing interception of an oral communication may direct a landlord or custodian, among others, to furnish the applicant with all facilities and technical assistance necessary to "accomplish the interception unobtrusively" (emphasis added). This provision is not for the protection of the subject of the interception order since it is to be incorporated only "upon request of the applicant". In sum, if the enforcement agent thinks that he can achieve such cooperation on his own, he need not get a court order to execute his mission "unobtrusively" with the cooperation of the landlord or custodian.
 
 
 60
 With its attention having been called to the need for doing the job "unobtrusively" to the point of enlisting the aid of persons whose aid would amount to trespass, Congress failed to include in Title III a provision such as is found in the New York Criminal Procedure Law Sec. 700.30(8) which requires that an eavesdropping warrant contain "[a]n express authorization to make secret entry upon a private place or premises to install an eavesdropping device if such entry is necessary to execute the warrant",--a provision added to the otherwise almost verbatim copying of 18 U.S.C. Sec. 2518(4). The judge to whom an application is made may, of course, require more than the statute prescribes before he is willing to sign the order, but the requirement that he separately sanction each surreptitious entry is nowhere to be found in the statutory scheme. That can hardly be due to congressional oversight. It is implicit that ordinarily only a single entry need be made, save in the exigent circumstance of equipment malfunction, as was the case here. Because the statute does not require the judge to authorize the manner of entry, a contention that the judge is nevertheless required to do so must rest on a reading of the Fourth Amendment itself.
 
 
 61
 The Fourth Amendment in part reads: "... no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized".
 
 
 62
 The orders here do conform precisely to the requirements of the Fourth Amendment as well as those of Sec. 2518. They particularly describe the premises to be "searched." They state that there is probable cause to believe that particular oral conversations of named persons and others concerning the specified offenses will be obtained through the interception at the named premises which, there is probable cause to believe, are being used for commission of the named offenses. "Prompt" execution of the authorization is ordered, and the interception is limited not only in time but to occasions when at least one of the named subjects is present.
 
 
 63
 Since the right of the named persons to privacy has already been subjected to the "probable cause" test at the hands of an independent judicial officer and since the order is detailed enough to defeat any realistic claim that it is a "general warrant," I believe that the basic requirements of the Fourth Amendment have been met. I respectfully suggest that cases which have held trespass to be invalid in the absence of any warrant whatever are hardly dispositive. But cf. the discussion in United States v. Ford, supra. In Berger there was a surreptitious entry but the Supreme Court failed to note it as a separate constitutional problem. See 388 U.S. at 45, 53-64, 81-82, 96-97, 107-12, 87 S.Ct. at 433. We do have here "the procedure of antecedent justification ... that is central to the Fourth Amendment." See Osborn v. United States, 385 U.S. 323, 330, 87 S.Ct. 429, 433, 17 L.Ed.2d 394 (1966).
 
 
 64
 Judge Smith notes that there may be a danger in surreptitious entry. That may be conceded, but the federal judge is hardly in as good a position to evaluate such risks as is the law enforcement agent. Common sense will suggest that, in the absence of a plausible ruse, the "bug" should be put in place when the premises are vacant. A mistake as to whether they are occupied, in fact, could hardly be corrected by a judicial order.
 
 
 65
 Now that attention has been called to this question in several circuits, it is hoped that Congress will provide the national consensus needed to reconcile the needs of law enforcement with the rights of privacy that belong to all persons until probable cause has been shown and the approval of an independent judge obtained. The finding of what the judge must do in these circumstances to keep the "search" reasonable is, I think, within the prerogatives of Congress. In the meantime, until the Supreme Court speaks, it might be advisable for district judges to make a general direction for forcible or surreptitious entry a part of the interception order, not so much on constitutional grounds, see United States v. Agrusa, 541 F.2d 690, 696-98 (8th Cir.1976),[1] as for the protection of the agents.
 
 
 66
 J. JOSEPH SMITH, Circuit Judge (dissenting):
 
 
 67
 I respectfully dissent. I would reverse for retrial as to all defendants, with all evidence obtained by electronic surveillance after warrantless surreptitious entries suppressed. The course followed by the agents here makes a mockery of the promise that the "dirty business" of electronic eavesdropping authorized by the Act of 1968, 18 U.S.C. Secs. 2510-2520 (1970), would be strictly supervised and controlled. Title III of the 1968 Crime Control Act was drafted with the Berger and Katz decisions as a guide, including the Katz requirement to "conduct the search within precise limits established by a specific court order ..." 1968 U.S.Code Cong. & Admin.News, pp. 2162, 2163. It is not too much to ask that a magistrate pass upon the necessity for and the manner of surreptitious entries into private premises, either business or residential, in light of the obvious dangers of injury and death to occupants and officers in the course of such gross invasions of privacy. The dangers may vary greatly between such methods as the planting of a bug by a restaurant patron, and a forcible breaking and entry when the premises are assumed to be unoccupied. The Congress recognized the existence of such devices as the martini olive transmitter, the spike mike, the infinity transmitter and the microphone disguised as a wristwatch, picture frame, cuff link, tie clip, fountain pen, stapler or cigarette pack. 1968 U.S.Code Cong. & Admin.News, p. 2183. Electronic devices in some instances might be installed in a manner not requiring entry by the officers into the premises. See United States v. Ford, 180 U.S.App.D.C. 1, 6 n. 20, 553 F.2d 146, 151 n. 20 (1977); cf. the "spike mike" of Silverman v. United States, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). Because of its dangers, "bugging" as distinguished from wire-tapping, is relatively little used. See United States v. Ford, supra, 553 F.2d at 149, n. 12. The choice of methods should be made known to and passed on by the magistrate.
 
 
 68
 The lack of warrants for the entries is not the only defect in the procedures used here. The delays in sealing and lack of timely progress reports to the judges, as well as the unauthorized reentires indicate a wide disregard for the intent of the Congress that the use of this dangerous tool be strictly supervised. We have been willing to excuse an occasional slip-up on timing as my brothers have pointed out. The perhaps inevitable result has been a progressive weakening of the safeguards. I would agree with the District of Columbia Circuit in Ford and draw the line here.
 
 
 
 [1]
 The Eighth Circuit said: "[W]hile there are two aspects to the search and seizure which occurred here [interception of oral communications after forcible entry] as compared with one in Osborn and Katz, this difference is, for constitutional purposes, one of degree rather than kind." 541 F.2d at 698. In Agrusa, though the order permitted "forcible entry at any time of day or night", it was challenged unsuccessfully on Fourth Amendment grounds